* Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

The petition for rehearing filed by appellants in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

**UNITED STATES of America**

v.

**Anthony DiSALVO, Appellant
in No. 93–1442.**

**UNITED STATES of America**

v.

**Robert F. SIMONE, Appellant
in No. 93–1463.**

**Nos. 93–1442, 93–1463.**

United States Court of Appeals,
Third Circuit.

Argued March 7, 1994.

Decided Aug. 31, 1994.

Sur Petitions for Rehearing Sept. 29, 1994.

Thomas Colas Carroll (argued), Philadelphia, PA, for appellant, Anthony DiSalvo.

Robert F. Simone, pro se.

William S. Lynch, U.S. Dept. of Justice, Frank J. Marine (argued), U.S. Dept. of Justice, Organized Crime & Racketeering Section, Washington, DC, Michael J. Rotko, U.S.

Atty., E.D.Pa., Philadelphia, PA, Lynn Panagakos, U.S. Dept. of Justice, Organized Crime & Racketeering Section, Washington, DC, for appellee.

Before: MANSMANN, LEWIS and SEITZ, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this consolidated appeal of Anthony DiSalvo and Robert F. Simone, we examine the appellants' affiliation with the hierarchy of the Philadelphia La Cosa Nostra (LCN) to determine whether their proven participation in LCN activities is sufficient to sustain their convictions on various offenses.

Following a jury trial in the United States District Court for the Eastern District of Pennsylvania, both DiSalvo and Simone were convicted of conspiring to collect a debt by extortionate means and of the substantive offense of extortionate collection of an extension of credit. Simone was also convicted of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), a substantive RICO charge and conspiring to affect interstate commerce through extortion.

We are asked to address a number of issues spanning the range of criminal jurisprudence—statute of limitations, sealing of the indictment, pre-trial publicity, the type, weight, reliability, and probative worth of evidence, after-discovered evidence, jury instructions, the effect of extra-record information upon the jury and the court's post-trial voir dire of the jurors. While we discuss all of the issues, of most concern is the question of the sufficiency of the evidence of implied threats which supports the convictions of using extortionate means to collect a debt.

In order to review these allegations of error, we must first set forth the facts proven at trial in their appropriate context. We must view the facts in the light most favorable to the government since its view prevailed at trial.

## I.

### Facts

#### A. Background

Members of the Scarfo family, and its nefarious affairs, are not strangers to our court.[1] This RICO enterprise was highly structured and governed by a distinct chain of command. At the top rung of the family ladder, the boss, Nicodemo Scarfo, oversaw the family activities. Directly below were the assistant managers—the underboss (second-ranking member) and consigliere (advisor). On the next level were the capos (captains), each of whom commanded a cadre of criminal soldiers. The top leadership, capos and soldiers were "made men", that is, formally initiated members of the LCN. The "made" members were assisted by associates—uninitiated colleagues answerable to their sponsoring LCN member. Associates were afforded a degree of protection from the sponsor they were "with," conditioned upon obtaining their superior's approval before conducting criminal ventures, giving an accounting and sharing resulting profits. Income was generated from illegal businesses such as gambling, loansharking, extortion and collection of a street tax (the "elbow") from non-LCN competitor criminals.

If family rules were violated, orders of the enterprise hierarchy disregarded or enterprise operations otherwise compromised, serious revenge was exacted. In fact, during the relevant time period, the Scarfo family committed numerous murders and attempted murders, numbering "made men," associates and outsiders as victims.

#### B. Simone and the LCN

Simone became acquainted with two members in the Scarfo organization, Nicholas Caramandi and Thomas DelGiorno, in the 1970's. Simone met Philip Leonetti in 1978 when Simone was retained to represent Leo-

1. *See, e.g., United States v. Scarfo*, 850 F.2d 1015 (3d Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *United States v. Eufrasio*, 935 F.2d 553 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).

netti on murder charges. Leonetti, Scarfo's nephew, was promoted to the underboss position in the Scarfo family in 1986. It was the testimony of Leonetti, now turned government witness, which provided the substance of the evidence against Simone and DiSalvo on the charges before us here.

Leonetti testified that shortly after Scarfo's ascension to leadership, Scarfo asked Simone to become a "made member" of the family. Although Simone declined, Scarfo told Simone that various bookmakers and loansharks to whom Simone was indebted would be instructed to forgive Simone's outstanding debts.

Leonetti chronicled other instances indicating Simone's closeness to the family. First, Simone never charged Leonetti and Scarfo fees for the extensive legal services he rendered for the family's inevitable run-ins with law enforcement authorities. Then, in May 1981, after Greek drug dealer Steve Bouras was murdered on Scarfo's orders, another dealer who was "with" Simone, George Botsaris, asked Simone to find out if Scarfo planned to kill him. When Simone relayed Botsaris' fears of being killed, Scarfo assured him that, as long as Botsaris took care of Simone, his life was not in jeopardy.

In 1987, while Scarfo and Leonetti were both in prison, Simone became concerned that his own life was in peril. Simone had represented George Martorano on drug charges. George pled guilty and received a sentence of life without parole. George's father, LCN member Raymond "Long John" Martorano, was displeased with Simone's representation of his son and Simone feared that Long John Martorano would seek retribution upon his release from prison. When Simone communicated his concerns to Scarfo, Scarfo allayed these fears by informing Simone that he had arranged to have Martorano killed if he was released.

Finally, recorded conversations between Simone and FBI cooperative, David Kurzband, an Atlantic City casino junket operator, established Simone's familiarity with both the members and the functioning of the Scarfo operation.

### C. *Simone and DiSalvo*

Leonetti testified that he had known DiSalvo since the 1970's and that they socialized on occasion. Leonetti described DiSalvo as a loanshark who was "with" the Scarfo family and, specifically, "with" Simone.

When Scarfo became the family boss, Simone asked Scarfo not to extract money from DiSalvo's loanshark business, i.e., to exempt him from payment of the "elbow." This arrangement continued for a while, but Simone eventually told Scarfo and Leonetti that DiSalvo should begin to share the proceeds from his business; Scarfo told Simone to instruct DiSalvo that a portion of the monies collected by DiSalvo would be split equally among Scarfo, Simone and Chuckie Merlino, Leonetti's underboss predecessor.

### D. *The Pelullo Loan Transaction*

Leonard, Arthur and Peter Pelullo are three brothers with ties to the Scarfo family. Arthur and Peter Pelullo were "with" the Scarfo family, thus, any dealings by or with them had to be cleared with Leonetti or Scarfo. At a December 1985 meeting among DiSalvo, Simone and Leonetti, DiSalvo informed Leonetti that he was having trouble contacting Leonard Pelullo regarding a $200,000 debt owed by Leonard to DiSalvo. DiSalvo offered Leonetti one-half of the proceeds collected if Leonetti would intercede and ask Pelullo to pay the debt.

Leonetti and Scarfo met with Leonard Pelullo at Scarfo's Florida residence. Leonetti outlined the meeting's agenda:

> [M]y uncle [Scarfo] was telling [Leonard] that Tony DiSalvo reached out for us and he needed help collecting this money, that he had to pay this $200,000. And Leonard Pelullo was telling him that he had a lot problems right now, ... he was going to be indicted for robbing $14 million from banks down there in Florida and he was having a little problem getting the money. But my uncle told him it wasn't his problem, that he would have to come up with this money. So Leonard Pelullo told him, "Well, Nick, give me a couple of days and I'll get back to you."

App. at 717a–18a. Shortly thereafter, Leonard Pelullo, Leonetti and Scarfo met and agreed that the debt would be dissolved if Pelullo paid $120,000 to DiSalvo. When by February 1986, Leonard Pelullo had not paid the $120,000, Leonetti met with Arthur Pelullo and explained his brother's situation. Arthur offered to pay Leonard's debt by turning over one of his restaurants but Scarfo declined this counteroffer.

Leonetti then approached Peter Pelullo about his brother's debt. Peter personally guaranteed payment of the debt and in February or March of 1986, DiSalvo was paid $90,000. Because DiSalvo was to receive 50% of the $120,000, Scarfo directed DiSalvo to keep $60,000 as total satisfaction of the debt. The remaining $30,000 was given to Leonetti who turned over $10,000 to Simone.

Pelullo was not asked for the $30,000 balance until January, 1987 when Scarfo was arrested and needed to fund his legal defense. Leonetti approached Peter Pelullo for payment and it was agreed that Pelullo would pay $10,000 per month for the next three months. Pelullo did pay $10,000 in each of the next two months. When in April, 1987, Leonetti was arrested, Pelullo paid the third installment to Leonetti's cousin. Simone received his one-third split from each of the final payments.

### E. *The Rouse Extortion*

After Rouse and Associates, a construction and real estate development entity, was chosen in May 1985 to construct a multi-million dollar project in the Penn's Landing area of Philadelphia, Leland Beloff, the City Councilman representing the Penn's Landing district, and his legislative aide, Robert Rego, sensed an opportunity ripe for extortion. Before construction could begin, two bills to facilitate funding for the program had to pass through the Philadelphia City Council. Beloff was responsible for introducing the legislation and shepherding it through the legislative process.

Beloff and Rego approached Nicholas Caramandi, a made member of the Scarfo family, to discuss the parameters of the scheme. Despite Beloff's status "with" Scarfo, it was his understanding that protocol demanded clearance with Simone.

Caramandi, Simone, Beloff, and Rego met a few weeks later. Simone conveyed Scarfo's approval of the plan and indicated that he was to receive a cut from the proceeds of the extortion.

On June 4, 1986, Rego set up a meeting with Peter Balitsaris, the Rouse employee charged with responsibility for the Penn's Landing project, and Caramandi, who presented a million dollar demand in exchange for Beloff's legislative "assistance." Immediately after the meeting, Balitsaris and Rouse contacted federal authorities and agreed to cooperate in an investigation of the extortion scheme.

On June 11, 1986, one day before the deadline for passage of the bills, Balitsaris met with Rego and, later, with Caramandi. Balitsaris recorded the conversations during which Caramandi repeated the extortion plan and demanded a $100,000 payment from Rouse as a good faith measure. Balitsaris then introduced Caramandi to FBI Agent James Vaules, posing as an employee of Rouse and Associates. Vaules produced $10,000, withholding the remaining $90,000 until the required legislation was passed. When Beloff placed the bills before Philadelphia City Council, Caramandi delivered $5,000 to Beloff's aide, Rego. Although Rego questioned the reduced amount, he accepted the money.

Caramandi reported to the family leadership the receipt of $10,000 and detailed the 50% split to Beloff and Rego. When Scarfo, Leonetti and Simone met, Scarfo reduced Beloff's and Rego's cut to 33% and ordered a 10% share for Simone. Simone was instructed to oversee Caramandi and Beloff to insure against unwanted intervention by law enforcement officials.

On June 17, 1986, Caramandi, Simone and others met to discuss a change in the split to Beloff and Rego. The conversations were recorded by John Pastorella, a government informant. Simone told Caramandi that Scarfo reduced Beloff and Rego's combined take to 33% of the extortion money. On June 21 or 22, 1986, Scarfo ordered Beloff's

and Rego's shares further reduced, reiterated that Simone would receive 10%, and that the remainder would be split among the Scarfo family.

On June 23, 1986, Agent Vaules told Caramandi that Rouse wanted a signal that Beloff was a player in the scheme before he would make further payments. Vaules was to observe Beloff at City Hall "pledging allegiance to the flag." When Caramandi could not be present at the appointed place and time, the signal was aborted. After Vaules left City Hall, FBI agents observed Beloff and Rego meet with Simone near the Hershey Hotel.

Simone's legal advice was sought on utilizing the "flag pledging" signal. Simone approved the signal, indicating that it was not a problem since it was nonverbal and public.

The signal was eventually given, but Vaules did not produce the payoff money. At a meeting at DiLullo's bar in Philadelphia, Caramandi related to Beloff, Rego and Simone his suspicions that Vaules might be a law enforcement agent. Simone, in turn, became concerned that agents had gathered outside their meeting place and immediately left the bar. When an FBI agent entered the bar, he observed only Rego, Beloff and Caramandi.

Despite his misgivings, Caramandi did not cancel his next meeting with Vaules. The evening before the scheduled meeting, DelGiorno told Caramandi not to meet with Vaules. The next morning, Caramandi told Simone that he would not meet with Vaules and that the legislation would be killed. Beloff put the bills on hold.

The following day, Caramandi, Beloff and Rego were arrested. Simone expressed his distress to DelGiorno over Rego's arrest, fearing he would be implicated. DelGiorno cautioned Simone to receive permission from Scarfo before any damage control action be taken. When Scarfo and Leonetti met with Simone, Scarfo was angry about the arrest, blaming Simone for the indiscreet use of the signal. Nonetheless, the charges were eventually dismissed and Scarfo praised Simone

for telling Caramandi not to pick up the money from Vaules. Simone, apparently believing the accolades were justified, replied, "I saved you a case."

## F.  *Indictment and Trial*

In October, 1991, Simone was indicted in the U.S. District Court for the Eastern District of Pennsylvania and charged in a six-count indictment with: (1) conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); (2) conducting or participating in a RICO organization, 18 U.S.C. § 1963(c); (3) conspiracy to interfere with commerce by extortion, 18 U.S.C. § 1951; (4) attempted interference with commerce by extortion; (5) conspiracy to collect extensions of credit by extortionate means, 18 U.S.C. §§ 894, 892; and (6) collection of extension of credit by extortionate means, 18 U.S.C. § 894, 892. The RICO counts, six predicate racketeering acts, and two collections of unlawful debts arise from Simone's involvement with the Scarfo enterprise. The extortionate collection of credit claims deal exclusively with the Pelullo loan. Finally, the Rouse extortion provides the backdrop for the interference with commerce counts.

DiSalvo was also indicted and charged with four of these counts: the conspiracy and substantive RICO counts and the conspiracy and substantive counts concerning the collection of the Pelullo loan.

The RICO counts incorporate counts three and four in the indictment as predicate racketeering act one; counts five and six of the indictment substantiate predicate racketeering act two.[2]

On December 16, 1992, the jury found DiSalvo guilty only on the counts relating to the Pelullo loan. Simone was convicted on the RICO counts, the Rouse extortion conspiracy count and both counts concerning the Pelullo loan transaction. Simone was acquitted on the substantive Rouse extortion count and racketeering acts three, six and seven.

---

**2.**  The district court granted DiSalvo's motion for judgment of acquittal on both RICO counts. The district court also granted Simone's Fed. R.Crim.P. 29 motion for judgment of acquittal on

predicate racketeering act five and all charged collections of unlawful debts alleged in the RICO counts.

DiSalvo was sentenced to imprisonment for one year and one day followed by three years probation. Simone was sentenced to a four-year prison term of incarceration and a four-year period of probation.

Both DiSalvo and Simone filed timely notices of appeal from their judgments of sentence. Our jurisdiction is pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The appellants raise many issues on appeal which we address seriatim.

## II.

### The Pelullo Loan

There are three points of error raised concerning the convictions for the extortionate collection of debt: the sufficiency of the evidence, the introduction of certain reputation evidence, and the trial court's instruction to the jury. Because we find the quantum of evidence question the most compelling, we address it first.

### A. § 894 Conviction Sufficiency of Evidence

DiSalvo and Simone argue that the government's evidence on this count is equally susceptible to a different interpretation which absolves them from guilt. Of course, we are not permitted by our scope of review to examine the trial in a different light; rather, we look at the evidence in a light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Nonetheless, the verdict must be supported by evidentiary proof beyond a reasonable doubt. Because of the "closeness" of this call, we will describe the supporting evidence and the relevant caselaw with some particularity.

The Pelullo loan counts were brought pursuant to the conspiracy and substantive provisions of 18 U.S.C. § 894, which provide:

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, ...

\*    \*    \*    \*    \*    \*

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

18 U.S.C. § 894(a) (1988).

The term "extortionate means" is defined at 18 U.S.C. § 891(7):

An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

18 U.S.C. § 891(7).

■ To establish substantive and conspiracy offenses under 18 U.S.C. § 894, it is not necessary to prove that explicit threats were used to collect or attempt to collect an extension of credit or that actual fear was instilled in the debtor or victim. *United States v. Polizzi*, 801 F.2d 1543, 1548 (9th Cir.1986). Rather, to establish a substantive offense, it is sufficient to prove that the defendant used, or aided and abetted another person to use, implicit threats to collect a debt. *United States v. Nakaladski*, 481 F.2d 289, 298 (5th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973). Here, in the absence of evidence of actual violence or express threat and since the debtor and his brothers did not testify, the convictions hinge on the "implicit threat" theory.

■ The gist of the insufficiency argument is that the mere use of Scarfo and Leonetti to facilitate collection of the debt does not supply a jury with sufficient information to conclude beyond a reasonable doubt that DiSalvo and Simone used or conspired to use statements which were reasonably calculated to instill fear in the Pelullo brothers in order to collect the debt. Additionally, the appellants assert that evidence that a disputed debt was arbitrated and negotiated by a known mobster does not amount to the use of extortionate means within the meaning of § 894.

Proceeding on an implicit threat theory, the government adequately demonstrated the following foundation elements: (1) DiSalvo operated a loanshark business; (2) DiSalvo was associated with Simone and separately, "with" the Scarfo LCN family; (3) Simone was close to Scarfo; (4) DiSalvo and Simone

knew that the use of threats of violence to collect debts was the modus operandi of the LCN and, particularly, of Scarfo and Leonetti; and (5) the affiliation of Arthur and Peter Pelullo "with" Scarfo required that any collection against Leonard had to be cleared with the top leadership.

Leonetti, whose testimony represented the major evidence against DiSalvo and Simone, characterized his role in the collection of the Leonard Pelullo loan as a "mediator." Leonetti averred that he was brought in because Pelullo's brothers, Anthony and Peter, were "with" the family, and, thus, his intercession was required as a matter of protocol. On redirect, however, Leonetti strongly implied that he was called in for a purpose other than arbitration. When questioned whether or not he had to threaten the Pelullo brothers, Leonetti responded in the negative. Asked whether explicit threats were necessary, Leonetti said that he did not have to threaten Leonard Pelullo: "Because he knew my uncle was the boss, and I was the underboss. He knew about the organization." App. at 985a.

Without testimony from the Pelullos, the only evidence of implied threat is Leonetti's own characterization of his role in the collection in the context of his reputation for violence. We note the similarities between these facts and those supporting the defendant's conviction on an implied threat theory in *Polizzi*, 801 F.2d at 1554–55. There the government likewise advanced a Mafia reputation theory to prove a § 894 implicit threat case. A debtor had borrowed money from Defendant Matranga. The debtor testified that he understood he would be hurt if he failed to repay. Evidence (FBI tapes) established that Matranga often threatened this debtor's life when he was delinquent with payments. Matranga also told the debtor that he would solicit the Mafia to collect the debt and instructed the debtor to call Defendant Polizzi, whom Defendant Matranga described as the "number four man" in De-

troit's organized crime family, regarding collection of the debt.

In affirming the judgment of conviction of Polizzi on the implicit threat theory, the court of appeals determined that: (1) the jury could conclude that Polizzi knew the debtor was paying an extortionate rate of interest and that Polizzi must have known that the debt was secured by threat of violence; (2) the jury could have inferred that because the debtor testified that collateral for the loan was "life and limb",[3] Polizzi should have been aware that threats had been utilized; (3) Polizzi was aware of Matranga's reputation for violence and exploited this fear; and (4) evidence indicated that Polizzi used his Mafia link to pressure the debtor into payment since the debtor had already testified to his fear of the organization. *Id.*

While the *Polizzi* evidence that the defendant was aware of the calculated use of threats against the debtor is more compelling than the *Leonetti/Simone* scenario surrounding the Pellulo loan, the case is nonetheless persuasive in upholding the *DiSalvo/Simone* convictions. Although the Pelullos did not testify, evidence established their knowledge of Leonetti's and Scarfo's roles as the underboss and boss of the Scarfo organization and their reputations in the context of debt collection. A reasonable jury could conclude that DiSalvo and Simone capitalized on Pelullo's knowledge of Leonetti's violent propensity, that Leonetti was brought in as a collection agent, and that Pelullo knew enough to be fearful of Leonetti's involvement.

Leonetti's intervention, standing alone, is not sufficient to prove a § 894 implicit threat case. We reversed, in *United States v. De Cavalcante*, 440 F.2d 1264 (3d Cir.1971), an extortion conviction based on an intra-mob debt settlement where the evidence, failing to demonstrate a conspiracy, could not prove anything more than that an honor-among-thieves arbitration had ensued. *Id.* at 1276. Other courts of appeals have rendered simi-

---

**3.** We note that while in common parlance security for these high interest loans is "life and limb," this understanding cannot excuse direct proof that implied threats were utilized in connection with this debt's collection. Indeed, we are mind-

ful that the district court here dismissed the charge regarding the extortionate interest rate because of insufficient evidence that the rate charged was unlawful.

lar decisions. *See United States v. Zimmitti,* 850 F.2d 869, 875–76 (2d Cir.1988) (an inference of threat by use of "intimidating" looking men to assist collection insufficient to support a § 894 conviction); *United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986) ("demand for money is simply not a threat").

It is Leonetti's own statement that his station and reputation in the Scarfo family, known by the Pelullos, relieved him from any necessity of utilizing express threats, which saves this case from a dismissal on insufficiency grounds as in *Zimmitti, Joseph,* and *De Cavalcante.* From Leonetti's assertion, the jury could reasonably infer that those familiar with Leonetti and the organization need not be specifically alerted to the repercussions of a failure to pay. This inference, arising from explicitly established facts, is itself a fact which we review under the clearly erroneous standard. We cannot say that the finding that DiSalvo and Simone utilized Leonetti to collect the Pelullo debt in order to instill fear in the debtor was a clearly erroneous one by the jury and, thus, cannot disturb this finding.

We are cognizant of DiSalvo and Simone's argument that the Pelullos' status "with" the family afforded the brothers favorable treatment and that because dealings with them must proceed through the proper hierarchial channels, Leonetti's participation was essential and not an option invoked to instill fear. While the evidence does establish the Pelullos' position within the family, other evidence graphically demonstrates that those "with" the family are by no means immune from the violent arm of the Scarfo organization.

Thus, the evidence supports the jury's finding that DiSalvo and Simone knowingly participated in the implicit threat of the use of violence to collect the Pelullo loan payments. By soliciting Leonetti and Scarfo to approach the Pelullo brothers regarding collection of the debt, DiSalvo and Simone knew that the presence of Leonetti would invoke an implicit threat of the use of violence since Leonetti's violent character was well known, as established at trial. By DiSalvo and Simone redirecting Pelullo's obligation to Leonetti, the jury could reasonably have concluded that the defendants were utilizing an implied threat of violence to intimidate Pelullo into making payments.

## B. *Reputation Evidence*

While DiSalvo and Simone do not point to any specific reputation evidence improperly admitted in proving the § 894 charge, they argue generally that the district court erroneously permitted the jury to consider Leonetti's reputation without fulfilling that statute's evidentiary requisites.

At issue is the background information elicited from Leonetti, both on direct and cross, concerning the criminal activities of both the Scarfo family and of himself. On direct examination, Leonetti testified that he was convicted of a RICO offense which included predicate crimes of murder (four completed and one attempted), illegal gambling, loan sharking, and extortion. He further revealed his agreement to plead guilty to two additional murders. Leonetti stated that members of the Scarfo family routinely extorted drug dealers, loansharks, and bookmakers who were not "with" anyone. Failure to pay could result in death. On cross, Simone elicited testimony from Leonetti concerning his and Scarfo's violent acts and reputations, in greater detail than that which was brought out on direct.

According to the appellants, only evidence sanctioned under §§ 894(b) or (c)[4] can be

---

4. The relevant portions read:

(b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b)(1) or the circumstances described in section 892(b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of

utilized to prove § 894 charges. Since subsection (b) refers to reputation of the creditor, here DiSalvo, evidence of Leonetti's collection practices was not sanctioned by that section. Likewise, subsection (c) cannot apply. Section 894(c) also refers to the creditor's collection practices and makes an additional provision for introduction of the defendant's reputation. Neither of these sections, argues Simone, allows for evidence of Leonetti's reputation to be considered.

Our decision in *United States v. Traitz*, 871 F.2d 368, 389–90 (3d Cir.), *cert. denied*, 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989), defeats Simone's argument that otherwise admissible reputation evidence may be rendered objectionable in a § 894 case if it does not satisfy the conditions of that statute. In *Traitz*, the defendants were charged with collection of credit by extortionate means in violation of 18 U.S.C. § 894. The district court admitted evidence of the defendants' uncharged acts of violence pursuant to Fed.R.Evid. 403 and 404(b), because such evidence showed " 'a shared tradition' of violence, ... a 'symbiotic relationship' ... [and] 'the background of the charges, the parties' familiarity with one another and their concert of action.' " *Id.*, 871 F.2d at 389 (quoting *United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir.1984)). Such evidence in a conspiracy context, we concluded, "constituted permissible grounds for admission of evidence of other violence under Rule 404(b)." *Id.*

Regarding the particular requisites of admissibility under § 894(b) and (c), Simone's exclusivity argument is foreclosed by our opinion in *Traitz*, where we held that these sections did "not provide independent limitations on the admissibility of evidence otherwise admissible under Rules 403 and 404(b)...." *Id.*, 871 F.2d at 390.

DiSalvo and Simone's final argument on the admission of this evidence references a pre-trial letter submitted by the government indicating that it would not use prior bad acts of the defendants under Fed.R.Evid. 404(b)

as evidence against them. We do not find that the government conducted its case contrary to this letter—the Rule 404(b) evidence of past bad acts was utilized to substantiate the violent reputations of the debt collectors, Scarfo and Leonetti, not DiSalvo and Simone.

Accordingly, there was no abuse of discretion in the admission of this evidence.

### C. *Jury Instruction*

The district court instructed the jury on the Pelullo counts as follows:

The Pelullo Counts 5 and 6 are separate counts from the racketeering act charged in Counts 1 and 2. Count 5 charges conspiracy. The same principles of conspiracy apply. The Government charges that there was a conspiracy to collect or attempt to collect a $200,000 debt between Anthony DiSalvo and Leonard Pelullo using extortionate means and from the Pelullo brothers. Both defendants here are named as co-conspirators.

Now, to extort means to exact out of somebody else money using threats of force or implied threats of force. That is to say, the exercise of any influence which is contrary to good morals and common honesty.

\*        \*        \*        \*        \*        \*

As to Count 6, the government has to prove that a defendant there did knowingly use himself or he knowingly aided and abetted, induced or procured somebody else to use extortionate means, implied threat of force, to collect $120,000 or some part of it from the Pelullos.

App. at 3348a–49a.

Although the appellants now contend that this instruction erroneously permitted the jury to consider the disputed reputation evidence on the § 894 charge, they did not make this objection before the district court. Rather, the reputation evidence was objected

---

collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community

of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.

to on a ground unrelated to the admissibility claim.[5]

Without a properly lodged objection to a jury instruction, we review the alleged deficiency only for plain error. *Government of Virgin Islands v. Knight*, 989 F.2d 619, 631–32 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993). "It is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

In any event, the alleged jury instruction error is based on the faulty premise which we rejected in *Traitz*, that reputation evidence was improperly admitted on the § 894 charges. Thus, we do not find any error, much less plain error, in the challenged jury instruction.

### III.

### *After–Discovered Evidence*

■ DiSalvo and Simone moved for a new trial pursuant to Fed.R.Crim.P. 33 asserting that after-discovered evidence required that the evidence against them on the Pelullo loan counts be revisited. A motion for a new trial is reviewed for abuse of discretion. *United States v. Adams*, 759 F.2d 1099, 1108 (3d Cir.), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 and 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985).

Before a trial court, in its discretion, may order a new trial due to newly discovered evidence, five requirements must be met: (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. *Id.*, 759 F.2d at 1108, (quoting *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)).

DiSalvo and Simone allege that statements made by Assistant U.S. Attorney Cole in *United States v. Pelullo*, 964 F.2d 193 (3d Cir.1992) (*Pelullo I*) and in *United States v. Pelullo*, 14 F.3d 881 (3d Cir.1994) (*Pelullo II*) constitute newly discovered evidence which entitles them to a new trial, in that they directly contradicted the government's position in the DiSalvo and Simone trial where its tactical interests were different.[6]

Once again Philip Leonetti was the government's star witness in its prosecution of

---

5. Counsel for DiSalvo objected as follows:

> Mr. Carroll: Judge, I had one substantial objection, I believe. The term extortion is used throughout the indictment in different contexts. And when your Honor was instructing on Counts 5 and 6, you made the observation that extortion in general is influence contrary to good morals and common honesty. And I would have no quarrel with that as a general proposition, but that at least in my client's interests, the charge in Counts 5 and 6 is a specific intent crime. It's a particular kind of extortion that requires more than just an influence contrary to morals and honesty. It has to be an attempt to obtain the collection through, as your Honor said, through threats or force of violence, either express or implied. And I'd be grateful if your Honor would make that clear to the jury that Counts 5 and 6 tied into the idea of specific intent, that there must be a specific intent by Mr. Simone as well to use that particular kind of means, not just extortion generally.

App. at 3361a.

In response, the district court further charged the jury:

> With respect to the counts involving claims of extortion as well as the racketeering acts involving extortion, be advised that what the Government is claiming, and the only thing the Government is claiming is that there was implied threats of force or violence. No other means of extortionate extortion are alleged with respect to Counts 5 and 6. With respect to the Rouse Associates matter, it is not—the claim is threat of economic loss, fear of economic loss.

App. at 3363a–64a. Appellants did not object to this supplemental charge.

6. *Pelullo I* details the RICO mail fraud trial of Leonard Pelullo which took place approximately one year before the *Simone/DiSalvo* trial. Pelullo was convicted of stealing $114,000 from a company. In *Pelullo II* he was retried for the same offense. That trial took place approximately one month after the *Simone/DiSalvo* trial concluded.

Leonard Pelullo. Throughout *Pelullo I* and *Pelullo II*, defense counsel highlighted Leonetti's reputation for violence by citing to his involvement in an array of homicides. Relevant to the present matter, defense counsel elicited testimony concerning the methods by which Leonetti collected debts. In both *Pelullo* trials Leonetti testified that DiSalvo solicited his assistance in collecting from Pelullo because he needed "some muscle." App. at 301a (*Pelullo II*). DiSalvo and Simone point to this statement and to the prosecution's statements regarding the presence of threats associated with Leonetti's collection of the Pelullo loan to demonstrate that the government changed its theory concerning the loan to conform to its divergent proof requirements in the two cases.[7]

The district court, dismissing the request for a new trial as "frivolous and inaccurate," pointed to the facts that (1) the *Pelullo* criminal cases concerned only Leonard Pelullo while the present prosecution involved all three brothers; (2) the *Pelullo* prosecutor's closing arguments are not considered evidence; (3) the evidence of implied threats was substantially the same in both prosecutions—specifically, there was no variance in the proof that Leonetti used his position in the family to threaten Pelullo implicitly to pay his debt.

The record supports the district court's findings of lack of inconsistency between the government's theories in *Pelullo I* and *Pelullo II* and the present case.

First, in *Pelullo I*, AUSA Cole made reference to Leonard Pelullo's choice to do business with Leonetti. Appellants urge, as an interpretation of this statement, that Pelullo was shielded from DiSalvo because of his brothers' affiliation "with" the Scarfo family; therefore, Leonetti had not employed threats to collect the debt from Pelullo. This argument lacks force since DiSalvo, also "with" Simone, would be considered on equal footing with Pelullo. Indeed, this view is substantiated by Leonetti's testimony at the *DiSalvo/Simone* trial that he viewed his role as an arbitrator.

Next, in *Pelullo II*, AUSA Cole argued that (1) Pelullo was not the victim of extortion; (2) there was no evidence that Leonetti had threatened anybody and (3) there was no evidence that Pelullo's family had been threatened. These statements arose in response to defense counsel's closing argument that the reason his client had embezzled money (the crime at issue) was because Leonetti had threatened him. *See* n. 7, *supra.* Superficially, these statements appear to demonstrate a reversal of the government's version of events concerning the Pelullo loan.[8] The prosecution offers, however, that

---

**7.** In raising an objection on cross-examination, AUSA Cole observed "[Pelullo's] not the victim of extortion." Later, Cole objected during defense counsel's closing:

> MR. FIORAVANTI: This case is unique in the sense that it causes me to wonder whether sometimes we ask more of juries than we have a right to ask. Ask more of them than is humanly possible. Because the first piece of evidence that you heard in this trial—and you will be reminded of it in the jury charge—is to the effect that in the context of the RICO charge, Count 55, you are entitled to consider that Len Pelullo has already been held responsible in connection with the repayment of the $114,000 loan to Mr. DeSalvo [sic], after he and his family were threatened by Philip Leonetti—
> MR. COLE: Objection.
> MR. FIORAVANTI:—and Mr. Scarfo.
> MR. COLE: Objection, your Honor. There is no evidence of that at all.
> MR. FIORAVANTI: This relates to Mr. Leonetti's testimony that he was the muscle—
> THE COURT: May I see you at sidebar? (Sidebar Discussion.)

> THE COURT: There is no evidence as to threatening?
> MR. COLE: Yes sir, and certainly not that his family was.
> MR. FIORAVANTI: If your Honor please, out of his own mouth he testified that he was run into this matter by muscle. He testified that he had a reputation for violence.
> THE COURT: (Inaudible.)
> MR. FIORAVANTI: He also testified that Peter and Arthur (inaudible), sir.
> MR. COLE: And he—
> MR. FIORAVANTI: I believe this is a fair argument.
> MR. COLE: He never threatened anyone.
> THE COURT: I will let it stand.

App. at 329a–30a. Further, in his own closing, Cole stated: "There is no suggestion in this case that anybody threatened anybody. There is no testimony in this case that anybody felt intimidated." App. at 342a.

**8.** Regarding the legality of the government's statements in one case as evidence in another, the Court of Appeals for the Second Circuit has

when considered in the context of defense counsel's emphasis on Leonetti's reputation for violence, Cole's use of the words "extortion," "threaten" and "intimidate," simply emphasize the fact that the case did not involve the type of express immediate threat which is an element of duress. None of Cole's statements, asserts the government, indicates that he, as an agent of the government, denied the existence of any implicit threats which might coexist with Leonetti's request for payment of the DiSalvo loan.

We are persuaded by the *Pelullo II* district court's numerous statements on this issue when raised in the case before it. At Pelullo's sentencing hearing, the district court stated that it was "surprised" by Pelullo's "inconsistent government positions" motion because:

> I never had any doubt what Mr. Leonetti was doing. If he isn't or wasn't at that time, a walking threat, I don't know what was. And when I looked at the part of the testimony that was pointed to in the motion filed in the other case, where the objection was made, I interpreted it to mean that Mr. Cole was objecting because there were no express threats made to the defendant and his family. But, I—other than—if there wasn't some threat involved in this, I don't know why anybody bothered getting Mr. Leonetti in it. That's the only reason. I mean, that was the whole tenor of this thing. ... I sat through this trial and there just never was any suggestion that this was a friendly gesture on the part of Mr. Leonetti to Mr. Pelullo with reference to this money.

App. at 353a.

In its written memorandum denying the motion, the *Pelullo II* district court further stated:

The record clearly demonstrates that the objection to Mr. Fioravanti's closing argument, with reference to threats to Leonard Pelullo and his family, was to the implication that there were express threats made by Mr. Leonetti. There were no express threats. That objection by the Government was the purpose of setting the record straight with respect to any alleged express threats. It cannot be interpreted to mean that the Government was taking the position that there were no implied threats in Mr. Leonetti's actions. The Government's entire theory with reference to this aspect of the case was that the implied threat posed by the use of Mr. Leonetti to collect the debt was the triggering event for Pelullo's theft of funds from the PBH bank account.

App. at 353a–54a.

Finally, the government's position here in *DiSalvo/Simone* is reinforced by its response to Defendant Pelullo's request for a pre-trial ruling in *Pelullo II* seeking to exclude evidence that Leonetti was a Mafia member. There the government argued that the evidence of Leonetti's nexus to the Mafia was relevant to show Pelullo's motive to steal money to pay DiSalvo because "[t]he threat posed by Scarfo and Leonetti was the triggering event for Pelullo's theft of funds from the PBH bank account." App. at 253a.

We, therefore, conclude that the district court did not abuse its discretion by denying appellants' motion for a new trial based on newly discovered evidence.

## IV.

### *Statute of Limitations*

18 U.S.C. § 3282 sets the statute of limitations for the Pelullo loan counts at five

---

held that clear and unambiguous admissions of fact made in an attorney's jury argument are not *per se* inadmissible in criminal cases. *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir.1984). In *McKeon* the government sought to have defense counsel's prior inconsistent opening statements admitted into evidence. The court of appeals found that the statements at issue were admissible, but recognized a need to circumscribe the evidentiary use of prior jury argument by instructing district courts: (1) to "be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial;" (2) not to admit "[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences;" (3) to insure that the "inconsistenc[ies were] clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial;" and (4) to "determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant." *Id.* at 33.

years. The indictment was handed down as to both defendants on October 2, 1991. Thus, for statute of limitations calculations, the prosecution had to show that the extortion continued after October 1986. The evidence establishes that the Pelullo loan collection effort ended in March, 1987, well within the five-year period. Thus, the initial statute of limitations argument, that the indictment was handed down beyond the statute of limitations, is without merit.[9]

In conjunction with this argument, DiSalvo separately contends that the indictment, as to him, was improperly sealed. While under investigation for the instant offenses, Simone was scheduled to serve as defense counsel in a criminal trial in Chicago beginning in October 1991. The trial was expected to last four months. Several months prior to the indictment against Simone, the Philadelphia U.S. Attorney advised the U.S. Attorney's Office in Chicago of their ongoing investigation of Simone. This information was relayed to the presiding judge in the Chicago trial, who held an appropriate hearing regarding Simone's representation in her jurisdiction.

At the hearing, the government explained that, although Simone had waived the statute of limitations,[10] the grand jury would most likely return an indictment in October of 1991 because of the government's concerns about the statute of limitations regarding DiSalvo and the expiration of the grand jury's term. The Chicago AUSA and the presiding judge then requested that the Philadelphia U.S. Attorney move to seal the indictment against Simone in order to avoid any publicity that might have an adverse impact on the prosecution of Simone's Chicago client sufficient to result in a mistrial.

On October 2, 1991, when the grand jury returned the indictment naming both DiSalvo and Simone, the government immediately moved to seal it in order to avoid compromising the Chicago trial. A magistrate judge granted the motion. Although Simone knew of the return and agreed to the sealing, DiSalvo was not notified and did not learn of his indictment until its unsealing on March 10, 1992. The district court concluded that the statute of limitations was tolled on October 2, 1991, when the indictment against DiSalvo and Simone was returned and sealed. Because the offense with which DiSalvo was charged carried a five-year statute of limitations, the district court determined that the cutoff date for a statute of limitation purpose was October 1, 1986. *See* 18 U.S.C. § 3282.

We accord great deference to the discretion of the magistrate judge in sealing an indictment and review the decision only for an abuse of that discretion.

The general rule is that the statute of limitations ceases to run when an indictment is returned to the district court notwithstanding the fact that it is subsequently sealed and may not have been known to the defendant for sometime thereafter. *United States v. Michael,* 180 F.2d 55 (3d Cir.1949), *cert. denied,* 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950). An indictment may be sealed for any legitimate law enforcement reason or where the public interest requires it. *Id.,* 180 F.2d at 57; *United States v. Mitchell,* 769 F.2d 1544, 1547 (11th Cir.1985), *cert. denied,* 474 U.S. 1066, 106 S.Ct. 819, 88 L.Ed.2d 792 and 475 U.S. 1028, 106 S.Ct. 1230, 89 L.Ed.2d 339 (1986). A properly sealed indictment then tolls the statute of limitations.

DiSalvo argues that the government did not present a legitimate law enforcement reason for sealing the indictment that pertained to him. Although as a general rule a defendant is required to demonstrate substantial prejudice in order to be entitled to the dismissal of an indictment sealed beyond

---

**9.** DiSalvo asserts that if the indictment was improperly sealed, the time difference in the sealing and unsealing dates presents a substantial jury question concerning the statute of limitations. The last overt act pled relating to the Pelullo counts is alleged to have occurred in or about March 1987. If the cutoff date is March 9, 1987, DiSalvo would have a factual question for the jury as the last overt act had not been proven to

have occurred after March 9, 1987. An instruction to the jury on this issue would obviously not have been available under the October 1, 1986 cutoff date.

**10.** In May, 1991 Simone had signed a waiver of the statute of limitations in order to complete his Chicago representation.

the statute of limitations, *see United States v. Shell,* 961 F.2d 138, 142 (9th Cir.), *opinion withdrawn on rehearing on other grounds,* 974 F.2d 1035 (1992), DiSalvo urges that because he is contesting the legitimacy of the basis for sealing the indictment, he need not show prejudice, citing *United States v. Maroun,* 699 F.Supp. 5 (D.Mass.1988). In *Maroun,* an indictment was dismissed after a determination that the issuing magistrate judge was not adequately informed of the reasons supporting the sealing. *Id.* at 7. Thus, the complaining defendant was excused from demonstrating prejudice.

■ Our task is to determine whether the indictment was properly sealed. If so, DiSalvo must demonstrate substantial prejudice in order to be entitled to the dismissal of the indictment. Because articulation of a legitimate law enforcement reason is sufficient to allow the sealing of an indictment, *Michael,* 180 F.2d at 57, a waiver on the part of DiSalvo or Simone is not a prerequisite for the granting of a motion to seal. We must thus address DiSalvo's argument that the reason offered by the government in its motion to impound the indictment, even if taken as true, does not merit its sealing because it did not relate to him and because avoidance of unwanted pretrial publicity does not equate to a legitimate law enforcement objective. DiSalvo also contends that because he was not involved in the Chicago trial, he could have been indicted separately from Simone without fear of adverse publicity to those proceedings.

DiSalvo does not offer any support for his assertion that the government must prove a distinct legitimate prosecutorial interest *relating to each defendant* named in an indictment to justify its sealing and we have likewise been unable to find any. Thus since here there is a showing of a legitimate law enforcement objective and no evidence that the government engaged in subterfuge to mislead the magistrate judge regarding the reason for sealing the indictment, DiSalvo has not shown that the judge's decision to seal was an abuse of discretion.

We conclude that the district court did not err in finding that the indictment was prop-

erly sealed on October 1, 1986 and that that date is the proper cutoff for statute of limitations purposes as to DiSalvo. Thus any act concerning the *Pelullo* loan occurring within March 1987 is well within the limitations period. Not having demonstrated prejudice traceable to the indictment's sealing, DiSalvo is not entitled to a new trial due to improper jury instructions on calculation of the cutoff date.

**V.**

### *Tape Audibility*

At trial, the district court admitted into evidence an audiotaped conversation which the government offered in order to prove that Simone conspired to interfere with interstate commerce in the Rouse extortion. The tape contained discussions between government witness Caramandi and Simone and between Caramandi and Scarfo at the Alhambra Bar in Philadelphia detailing the "split" of the Rouse extortion proceeds. The tape represented the most persuasive evidence linking Simone to the crime.

■ Prior to trial, Simone objected to admission of the tape on the grounds of inaudibility and because the various speakers were not properly identified. At a hearing in August of 1992, the trial judge listened to the tape—using a transcript as an aid. After the tape was played, Simone vigorously argued that it was inaudible and that certain phrases were erroneously attributed to him. The judge listened to the tape again and ruled it inadmissible because it was not audible.

At a second hearing regarding the tape, the judge listened to an enhanced tape, again utilizing a transcript. This time the judge ruled that the enhanced tape was audible. Simone argued that, in two places on the tape, the identity of the speaker was questionable. An FBI agent then testified that he prepared the transcript of the tape and that, although he was not present at the site of the conversation, he was certain of the identity of the voices on the tape because he

had personally talked to the individuals on numerous occasions.[11]

Recordings are admissible " '[u]nless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy.' " *United States v. Arango–Correa,* 851 F.2d 54, 58 (2d Cir.1988) (quoting *Monroe v. United States,* 234 F.2d 49, 55 (D.C.Cir.), *cert. denied,* 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956)). Although Simone did not make a specific objection to the playing of the tape, he urges our court to listen to the tape without the aid of a transcript to determine if it is audible. We have listened to the audio tape and cannot say the trial court abused its discretion by admitting the transcript upon finding it sufficiently audible for use at trial.

Simone also complains that the jury was allowed to use a transcript of the tape which was not proven reliable by the government due to the inaudibility of the tape and because he was misidentified as a speaker. Once again, the standard of review for use of the transcript as a listening aid is an abuse of discretion. *Government of Virgin Islands v. Martinez,* 847 F.2d 125, 129 (3d Cir.1988).

We find that the district court's decision regarding the jury's use of the transcript was not an abuse of its discretion. First, Simone fails to point out where he has been misidentified. Second, Simone did not object to allowing the jury to use the transcript as a listening aid. Finally, the district court carefully warned the jury on several occasions that the transcript was not evidence.

■ Also without merit is Simone's challenge, raised initially on appeal, to the instruction by the district court regarding an enlargement of the transcript utilized by the government in its summation. Simone's cites the last paragraph of the judge's instruction [12] as an invitation to the jury to rely on the transcript rather that the tape. We have reviewed the court's instruction and conclude that it emphasizes that the transcript was not evidence. Moreover, using the plain error standard, we conclude that the government's use of the enlargement during the closing did not infect the trial with unfairness which tainted the conviction or caused a denial of due process. *See Darden v. Wainwright,* 477 U.S. 168, 179, 106 S.Ct. 2464, 2470–71, 91 L.Ed.2d 144 (1986).

## VI.

### *Simone Reputation Evidence*

■ Simone argues that, in three instances, unsavory acts involving him were introduced at trial in violation of the Federal Rules of Evidence.[13] Prior to trial, the government had filed a trial brief under seal in which it set forth a summary of the evidence it intended to produce at trial. In response, Simone filed in limine motions to exclude certain evidence based on Fed.R.Evid. 403 and 404(b). The trial judge held a confer-

11. Simone never indicated specifically where he was incorrectly identified as a speaker on the tape, but twice preserved the right to object to the identity of the speakers at trial.

12. The district court instructed as follows:

There is disagreement as to the accuracy, the reliability of the transcript as attested to by Mr. Caramandi. And the Government is permitted to use a chart here which covers what Mr. Caramandi says he heard. That's a matter of credibility, that's separate from what you, yourself can hear or what you cannot hear.

There are two kinds of evidence. One is what a person says he heard and that's as though there was no tape. And the other is the tape. And as to the tape of the June 17, 1986 conversation, it is what you hear that is evidence. If you can't hear it, it's not evidence.

Now, as to that tape, that tape is in evidence and in your deliberative process you can listen to that tape as many times as you want, with or without aid of the transcript. You'll recall during the trial you listened to it with a transcript and you also listened to it without a transcript.

App. at 3012a–13a.

13. The specific evidence challenged by Simone was his relationship with Greg Botsaris, a drug dealer, who attended Simone's wedding in 1980. In 1980, Simone took Botsaris to Scarfo and Leonetti and asked that his life be spared. Scarfo indicated that Botsaris would not be killed if he took care of Simone. Second, Scarfo forgave Simone's gambling and loanshark debts. Third, when Scarfo and Leonetti were in prison in 1987, Simone told them that Raymond "Long John" Martorano was angry at Simone because he had represented his son at a drug trial and his son received a life sentence. Scarfo told Simone not to worry because if the elder Martorano was released from prison, he would be killed.

ence, examined the government's statement of facts, and made preliminary admissibility rulings pursuant to Rules 403 and 404(b). At this time, the trial judge excluded evidence that Scarfo had discussed the planned murders of three LCN members with Simone.[14]

At trial and over objection, the district court allowed Leonetti to give testimony to prove Simone's knowing participation in and association with the RICO enterprise. Both were essential elements of the RICO charges and were also offered to show Simone's familiarity with the enterprise's illegal activities, the nature of his relationship with other conspirators and members of the RICO enterprise, and his knowledge of the violent nature of Scarfo and the enterprise.

The district court ruled that the contested evidence was neither cumulative nor unduly prejudicial under Rule 403. The court instructed the jury as to the limited use of the association evidence to prove the existence of the enterprise and Simone's participation therein.

Our decision in *United States v. Eufrasio*, 935 F.2d 553, 572-73 (3d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991), is dispositive. There we upheld admission of similar evidence of uncharged Mafia criminal activity to prove the elements of the charged RICO offense—the defendant's knowing association with, ironically, the Scarfo family, and participation in the unlawful business of the enterprise. The evidence of uncharged conduct was deemed probative because of the common elements of the other crimes with the crimes actually charged. The admission was upheld even in the absence of an articulated 403 weighing. Thus, the admission of evidence of Simone's affiliation with Scarfo, indicative of knowl-

edge of the structure of the family enterprise, did not violate Rule 403.

## VII.

### *Sixth Amendment*

DiSalvo and Simone argue that they were denied their Sixth Amendment right to a fair trial.[15] Specifically they cite: (1) the dissemination of widespread prejudicial material during the trial which was more than likely to reach the jurors; (2) premature discussions among the jurors; (3) the trial judge's failure to adequately probe the possibility of juror prejudice; and (4) the failure of the trial judge to question a juror who had made a biased remark. These errors, assert DiSalvo and Simone, can only be rectified by the grant of a new trial. We review the district court's order denying a new trial based on alleged prejudicial information for an abuse of discretion. *Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir.1985).

We have held it "fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influence that may subvert the fact-finding process." *Waldorf v. Shuta*, 3 F.3d 705, 709 (3d Cir.1993). With this benchmark in mind, we address whether defendants' Sixth Amendment fair trial rights were compromised.

### A. *Publicity*

The district courts utilize a three step procedure to determine whether publicity during the course of the trial has prejudiced the jury. "First, a court determines whether the news coverage is prejudicial. Second, if it is, the court determines whether any jurors

---

**14.** The evidence of Simone's alleged knowledge of these murders was submitted to the district court in the government's pre-trial brief placed under seal. Although we would ordinarily be reticent to mention these sensitive matters in a published opinion, neither the briefs nor reproduced record which refers to the murders were filed with us under seal. In addition, Simone notes in his brief that, despite the pre-trial secrecy, some of this information was reported in the press. It thus appears that this material is now

within the public domain and is appropriately referenced in this opinion.

**15.** Only Simone raised the fair trial issue in post-trial motions before the district court. On appeal, pursuant to Fed.R.App.P. 28(i), DiSalvo adopts the argument on this issue as detailed in Simone's brief. Because, however, we are reviewing Simone's assertions of error in the district court's denial of the motion, we often refer only to Simone in our discussion.

were exposed to the coverage. Third, if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality." *Id.* at 709–10 (citing *United States v. Jackson,* 649 F.2d 967, 976 (3d Cir.), *cert. denied,* 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981)).

■■■ Concerning the content of the publicity, Simone refers particularly to several newspaper articles which either mentioned that he had twice been acquitted by federal juries, characterized him as a "mob lawyer," or made reference to a prior charge of tax evasion levied against him. Simone also claims that two separate television programs which aired during the course of the trial and deliberation, a "60 Minutes" segment and an NBC mini-series entitled "Deadly Matrimony," could serve as a potential source of prejudicial extra-record information. The district court found that none of the publications makes reference to the fact that Simone had committed a crime, had been convicted of a crime or had acknowledged that he was guilty of any conduct charged in the indictment. We note additionally that while the "mob lawyer" characterization was not necessarily flattering to Simone, use of this term is not sufficiently prejudicial to constitute a violation of Simone's Sixth Amendment rights. We find no abuse in the court's discretionary call that the articles were not prejudicial.[16]

Thus, DiSalvo and Simone do not present a meritorious argument that the district court abused its discretion in deciding that the articles were not prejudicial.[17]

■■■ With respect to the second prong of the *Jackson* test, (juror exposure to the material), media publications reported that subsequent to the jury verdict, Juror Dennis Kline stated he had second thoughts about the verdict and that other jurors had violated the court's instructions by reviewing news reports or discussing the case with family members. In response to Simone's post-trial request to interview the jurors, the district

---

**16.** Simone cites to our *Waldorf* opinion as conclusive authority that even a marginally prejudicial article may have a disproportionate impact on the jury depending on the time the jury becomes aware of it. There, at least half of the eight-member civil jury, just prior to rendering its own verdict in a personal injury case, was exposed to news coverage—via a newspaper that was brought into the jury deliberations and a television news program—that a $30,000,000 verdict had been awarded in a similar case. Because the district court's voir dire did not elicit sufficient information to confirm or dispel the presence of suggested prejudice among the jury, we granted a new trial. *Waldorf* can be readily distinguished by our conclusion there that the news article *was* indeed prejudicial.

Nor does our recent decision in *Government of Virgin Islands v. Weatherwax,* 20 F.3d 572 (3d Cir.1994), assist Simone's argument. In *Weatherwax,* unlike the somewhat benign instances of negative publicity cited by Simone, a newspaper, in both a banner headline and in the text of the story, misquoted the defendant's testimony. The inaccurate reporting had the obviously prejudicial effect of defeating Weatherwax's claim of self-defense to a murder charge. Also, in *Weatherwax* the district court did not conduct any voir dire to evaluate the prejudicial article's possible impact on the jury and resulting taint to the trial. *Id.* at 580.

Indeed we have previously held that media coverage more explicit than that at issue in this case was not prejudicial. *See United States v. Gilsenan,* 949 F.2d 90 (3d Cir.1991) (media cov-

erage of failed plea agreement could not have prejudiced defendants), *cert. denied,* —— U.S. ——, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992); *United States v. DeLarosa,* 450 F.2d 1057, 1061–62 (3d Cir.1971) (four jurors were exposed to news media reports of shooting into home of government's chief witness), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 and 405 U.S. 957, 92 S.Ct. 1189, 31 L.Ed.2d 236 (1972). Moreover, as observed in *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 151 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), "[t]hough 'the specific guarantees of an impartial jury and of confrontation,' as well as 'the more general one of due process,' proscribes consideration of specific extra-record facts about the case on trial, it is not necessary that the jurors be 'totally ignorant about a' case." *Id.* (quoting *United States ex rel. Owen v. McMann,* 435 F.2d 813, 817 (2d Cir. 1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971)).

**17.** The argument with respect to the television broadcasts likewise fails. In addition to conceding that the television segments "did not mention Simone or the trial," Simone makes only bald allegations that "the facts surrounding both shows, if viewed by the jurors, could have had a devastating prejudicial effect on the outcome of this case." Appellants' Reply Br. at 25. Simone does not put forth any factual or legal analysis explaining the relevance of these two media segments to the issue before the court and, therefore, we have not addressed them in detail.

court conducted *in camera* interviews with 15 of the 16 jurors.[18]

■ The interviews revealed that several jurors had limited exposure to media coverage showing the contents of a note from the jury to the court[19] or an artist's sketch of the jurors themselves. That exposure, however, was limited to instances in which a news report came on while the juror was in another room, while "flipping" through the channels, and, in the case of the sketch, by a spouse's comment that certain jurors were identifiable in an artist's sketch. Otherwise, the jurors denied any exposure to media publications concerning the case.

The district court then denied Simone's motion for a new trial, concluding that "all the jurors followed its instructions not to read anything or view anything or discuss anything *about the case....* The instructions given, and the reminders given, regularly during the trial were sufficient to avoid extraneous prejudicial information entering into the deliberations." *United States v. Simone,* No. 91–569, slip op. at 6–7, 1993 WL 106478 (E.D.Pa. Apr. 11, 1993) (emphasis in original). The district court noted "there is *no evidence* that any juror reviewed, read or came into contact with any extraneous prejudicial information about either defendant

during juror service." *Id.* at 2 (emphasis in original).

In addition, several times during the course of the trial, the district court instructed the jurors not to prejudge the case and to avoid any media publications as well as premature discussions about the case. In each instance the jurors indicated that they had followed the court's instructions. We have stated on numerous occasions that the jury is presumed to have followed the district court's instructions. *Thornton,* 1 F.3d at 156; *Gilsenan,* 949 F.2d at 96. Here, any perceived disregard of the court's instruction is best characterized as happenstance.

Finally, we reiterate that not every exposure to extra-record information mandates a new trial. *Id.* at 97, (citing *Government of Virgin Islands v. Dowling,* 814 F.2d 134, 139 (3d Cir.1987)).[20] In determining whether or not a district court abused its discretion by denying a new trial on the basis of alleged prejudicial information, the appellate court must conduct an " 'objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror.' " *Waldorf,* 3 F.3d at 710 (quoting *Gilsenan,* 949 F.2d at 95). The contents of a jury note (written by the jury itself) and the viewing of an artist's sketch of the jurors themselves, cannot serve as sources of prejudicial extra-record information.[21]

---

18. We find the challenge to the *in camera* voir dire procedure to be without merit. The particular method of conducting voir dire is left to the sound discretion of the district court. *See United States v. Resko,* 3 F.3d 684, 688 (3d Cir.1993); *United States v. Thornton,* 1 F.3d 149, 155 (3d Cir.), *cert. denied,* ── U.S. ──, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993). Here, the district court held *in camera* interviews with fifteen jurors (including alternates), who testified under oath and in the presence of the defendants and the government, regarding the extent and nature of any extrajudicial information that may have reached the jury. The record adequately supports the district court's finding that the jurors did not view any media publications concerning the substance of the case, with the exception of the two instances we discuss. We address Simone's challenge to the court's failure to examine the remaining juror, Bocchieri, in the text, *supra.*

19. On December 8, 1992, the jury sent a note to the court stating that they had reached an impasse and that several jurors refused to accept the testimony of certain witnesses. The jury later resumed deliberations and the district court

placed the note under seal. It is unknown how the press learned of its contents.

20. Reliance on this court's decision in *Dowling* is misplaced. Unlike the material at issue here, the court in *Dowling* concluded that the information received by the jury had the "potential for substantial prejudice" because it related to the facts of the case and the defendant's prior conviction for bank robbery, the same charge as in the case being tried. 814 F.2d at 139–40.

21. Simone's citation to *Resko* for support of his assertion that he is not required to show prejudice is contrary to the explicit holding of that case. In *Resko* we recognized that while ordinarily a defendant must establish prejudice before a new trial will be ordered, under the limited circumstances of that case, i.e., jury misconduct was discovered mid-trial and the district court refused to conduct an individualized *voir dire,* the convictions were vacated and the case remanded for a new trial. *Id.* at 686. There are no factual similarities between *Resko* and the case before us.

Accordingly, the district court did not abuse its discretion in concluding that the jurors were not prejudiced by any media publications that may have reached them during the course of trial or during deliberations.

## B. *Adequacy of the District Court Inquiry into Possible Bias and Premature Discussions*

"A criminal defendant is entitled to a determination of his ... guilt by an unbiased jury based solely upon evidence properly admitted against him ... in court." *Government of Virgin Islands v. Dowling,* 814 F.2d 134, 138 (3d Cir.1987). Furthermore, "[i]t is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *Resko,* 3 F.3d at 688.

With respect to Simone's assertion that jurors engaged in premature discussions regarding the media publication of the "stalemate" note and the artist's sketch, we have dispelled any claimed prejudice stemming from conversations carried on by jurors prior to deliberations. Because the contents of both publications were known by the jurors through first-hand knowledge, i.e., they involved the jurors themselves, they are more akin to intra-jury influences. We held in *United States v. Resko,* 3 F.3d 684 (3d Cir. 1993), that, with respect to such influences, although "the proper *process* for jury decisionmaking has been violated ... there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *Id.* at 690 (emphasis in original).

In addition to discussions regarding the note and the sketch, Simone claims that jurors engaged in premature discussions that tend to show that certain jurors were biased or were affected by extra-jury influences. Particularly, Simone points to the statements

allegedly made by Jurors Gouger and Bocchieri after the opening arguments that "This is going to be a guilty verdict," App. at 3677a, 3737a–38a; and to a statement made during deliberations [22] that "[A]n individual can't get to that point where they cannot be guilty ... [Y]ou can't get into this situation and not be guilty," App. 3678a; and to the statement made by Juror Bocchieri in essence that "You better watch what you say or Simone will put his men on you." App. at 3717a–18a. These statements were allegedly overheard by Nessle, an alternate juror. After the jury rendered its verdict, Nessle and Kline had various conversations. During one such conversation, Nessle allegedly conveyed this information to Kline.

Simone's allegation that the statements allegedly made by Gouger and Bocchieri after opening statements demonstrate bias is without merit. First, the district court concluded, after extensive questioning of both Jurors Kline and Nessle, that no such statement was made. This conclusion was reached after the district court interviewed and re-interviewed both jurors.[23] During the re-questioning of Nessle, and contrary to Simone's version of events, the district court specifically asked Nessle to relate the contents of his post-verdict conversations with Kline. Nessle testified that he told Kline, "[T]here's a couple of jurors that I imagine probably already had their minds made up." App. at 3743a. Nessle assumed Bocchieri was biased based on the statement regarding "Simone's men." He also believed Gouger was biased based on his "opinion of [her] personalit[y]" and the fact that "[she] didn't seem open minded about anything." Based on the exhaustive inquiry conducted by the district court, its finding that no such statement was made was not clearly erroneous nor was the manner in which the inquiry conducted an abuse of discretion.

The district court also properly refused to inquire further into the statement made during deliberations that "you can't get

22. It appears that Simone disputes the fact that this statement was allegedly overheard during deliberations. A review of the transcripts from the *voir dire,* however, clearly shows that Juror

Kline recalled the statement being made during deliberations. App. at 3677a–78a.

23. Actually, Kline was called a third time.

into this situation and not be guilty." Once the district court determined that the jury had not considered prejudicial extra-record information,[24] Fed.R.Evid. 606(b) precluded additional questions which would have the effect of delving into the deliberative process of the jury.[25] Fed.R.Evid. 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the jurors mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly bought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The courts have strictly enforced this mandate and have precluded inquiries regarding alleged jury misconduct or bias absent the existence of extra-record information or extra-jury influence. *See, e.g., Tanner v. United States,* 483 U.S. 107, 116–17, 107 S.Ct. 2739, 2745–46, 97 L.Ed.2d 90 (1987); *Government of Virgin Islands v. Nicholas,* 759 F.2d 1073, 1077–78 (3d Cir.1985).

■ We turn finally to the district court's decision not to examine the last juror—Juror # 9 (Bocchieri).[26] As Juror Nessle testified: "The incident was we were, as jurors we were just joking around and [Bocchieri] said to another: 'You better watch what you say or Simone will put his men on you.' And it was all meant as a joke and everybody laughed, but then everybody was obviously uneasy about well, why did that juror say that?" App. at 3717a–18a. After conducting interviews with fifteen of the sixteen jurors, the district court concluded that the statement was made in a "jovial atmosphere" and was viewed by the jurors themselves as a "non-serious remark unrelated to the merits of the case." [27] *Simone,* slip op. at 4, 1993 WL 106478. This finding, in conjunction with Rule 606(b)'s prohibition against conducting post-verdict inquiry regarding a juror's statement in relation to his state of mind in deliberations and the court's earlier determination that no extra-jury influence was present, served as the basis for the district court's refusal to conduct additional interviews. Accordingly, the district court did not abuse its discretion in failing to conduct a subsequent interview with Bocchieri.

■ Moreover, a hearing need not be held at the behest of a party whose allegations, if established, would not entitle it to relief. *See Government of Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989). Assuming arguendo that the allegedly biased statement had been made, its effect on jury deliberations could not be ascertained as such inquiry is proscribed by Rule 606(b). In addition, jurors' expressions of fear or apprehension of a defendant do not, per se, establish juror bias. *See Thornton,* 1 F.3d at 155. In the case at bar, there was sufficient testimony to justify the court's conclusion that

---

24. Juror Kline, who allegedly overheard this statement, testified that he could not say that the disputed comments were based on any extraneous source. App. at 3745a–46a.

25. In addition, such comments cannot be used to impeach a verdict. *See Gereau,* 523 F.2d at 148.

26. In a civil matter involving media access to the jury interviews, *United States v. Simone,* 14 F.3d 833 (3d Cir.1994), we issued a stay of the *in camera* proceedings. The district court later concluded it was not necessary to resume the interviews.

27. This is just one factor distinguishing this case from *United States v. Dean,* 647 F.2d 779 (8th Cir.1981), *rehr'g,* 667 F.2d 729 (8th Cir.), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982) quoting *United States v. Dean,* (*Dean I*), Nos. J–CR–79–1 and J–CR–79–10, slip op. at 6 (E.D.Ark. Sept. 26, 1979). *Dean* involved a case where actual juror bias had been established, thereby preventing the juror from impartially deciding the case. Unlike the case at bar, the juror in *Dean* had " 'a settled disposition ... to convict [appellant] regardless of the evidence.' " *Id.,* 647 F.2d at 782. No such disposition or bias has been shown by Simone.

this statement was even less than an expression of fear; it was a "joke." As the court observed in *Thornton*, when the jury is instructed to base its verdict solely on the evidence and it acquits the defendant of certain counts, such factors indicate that the jury was not biased. *Id.* at 156. *See United States v. Gilsenan*, 949 F.2d at 94. Those same factors are present here.

We conclude that the district court did not abuse its discretion in denying the motion for a new trial on Sixth Amendment grounds.

## VIII.

### *Conclusion*

For the reasons stated above, we will affirm the judgments of conviction and sentence.

No. 93–1442

United States of America

vs.

Anthony DiSalvo

SUR PETITION FOR REHEARING

Sept. 29, 1994

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE and SEITZ,* Circuit Judges.

The petition for rehearing filed by appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Hutchinson would have granted rehearing.

No. 93–1463

United States of America,

vs.

Robert Simone, Appellant

SUR PETITION FOR REHEARING

Sept. 29, 1994

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE and SEITZ,* Circuit Judges.

The petition for rehearing filed by appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Hutchinson would have granted rehearing.

---

* Senior Circuit Judge Seitz voted only as to panel rehearing.

* Senior Circuit Judge Seitz voted only as to panel rehearing.