

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-22-1997

# Barry v. Bergen Cty Probation

Precedential or Non-Precedential:

Docket
96-5577

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Barry v. Bergen Cty Probation" (1997). *1997 Decisions.* Paper 247.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/247

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 22, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5577

MICHAEL C. BARRY

v.

BERGEN COUNTY PROBATION
DEPARTMENT, Hackensack, N.J.;
ATTORNEY GENERAL OF THE STATE OF NEW JERSEY

      Bergen County Probation Department,
      Peter Verniero, Attorney General
      of New Jersey,

      Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 94-cv-03258)

Argued August 12, 1997

BEFORE: STAPLETON, GREENBERG and COWEN,
Circuit Judges

(Filed October 22, 1997)

      Peter Verniero
      Attorney General of New Jersey
      Arthur S. Safir, Esq. (argued)
      Deputy Attorney General
      Richard J. Hughes Justice Complex
      Trenton, NJ 08625

       Counsel for Appellants

      David M. Quirk, Esq. (argued)
      11 Seymour Street
      Montclair, NJ 07042

       Counsel for Appellee

OPINION OF THE COURT

COWEN, Circuit Judge.

This is an appeal from a judgment of the district court, dated August 7, 1996, granting petitioner-appellee Michael C. Barry's petition for a writ of habeas corpus. The district court held that it had subject matter jurisdiction to consider Barry's petition because his community service obligation constituted custody for purposes of habeas corpus review pursuant to 28 U.S.C. S 2254(a). The district court further held that, because the media coverage at issue had the potential to prejudice one or more jurors, the trial judge's failure to voir dire the jurors violated Barry's Sixth Amendment right to a fair trial. In addition to granting the petition, the district court ordered that Barry be released from his community service obligation. The district court made no provision for the State to retry Barry.

Respondents-appellants, the Bergen County Probation Department and Peter Verniero, the Attorney General of New Jersey (collectively, "the State"), contend that the district court erred in its determination that Barry was "in custody" for habeas corpus purposes and that the media coverage potentially prejudiced the jury. Moreover, the State argues that the district court erred by releasing Barry from his community service sentence without providing the State with an opportunity to retry him.

We hold that Barry was "in custody" for purposes of 28 U.S.C. S 2254(a) when he was resentenced in 1993 to 500 hours of community service. We further hold that the media coverage at issue did not have the potential to prejudice the jury. Accordingly, the judgment will be reversed, and we need not consider whether the district court erred by failing to provide the State with an opportunity for retrial.

I.

Dr. Michael Barry served as medical director of the Fort Lee Stress Relief Clinic. During its brief period of operation, 845 patients generated 2,429 visits and 2,337 prescriptions for the drug Quaalude. Nearly every prescription was for forty-five tablets, regardless of a patient's prior history.

Barry and a number of codefendants were indicted by the State of New Jersey on: sixteen counts of dispensing the drug Quaalude not in good faith in the course of professional medical practice, in violation of N.J. STAT. ANN. SS 24:21-9, :21-15 (West 1997), :21-19(a)(1), :21-19(b)(3) (repealed by L.1987, c. 106, S 25, operative July 9, 1987) (West 1997), and 2C:2-6 (West 1995); three counts of dispensing Quaalude and Diazepam, in violation of those

same statutes; one count of maintaining a drug resort, in violation of N.J. STAT. ANN. SS 24:21-21(a)(6), :21-21(b) (West 1997), and 2C:2-6; and one count of conspiracy to dispense the drug Quaalude not in good faith in the course of professional medical practice and to maintain a drug resort, in violation of N.J. STAT. ANN. SS 24:21-24(a) (West 1997), and 2C:5-2 (West 1995). The trial, which lasted almost five months, commenced on January 4, 1982.

On February 18, 1982, the trial court became aware of two newspaper articles that appeared in the Herald Dispatch. The court admonished the jury:

> There are just a few things I must call to your attention, and one of them is that there have been articles in the newspaper and they have been called to my attention, about this case.
>
> It's also been called to my attention that the articles are not accurate. I am not critical of the articles in any sense, that's none of my business what's in the article, but it is our business to ask you not to read them. Remember I said at the outset that you as the jury in this case are the judges. You will be the judges in the trial. You'll be the sole and final judges in this trial and you'll have to decide this case based solely on the evidence that you see and you hear that takes place in this courtroom. I will continue to ask you, and if I don't forget, I will be telling you this every day, I will remind

3

> you not to read the newspapers. If you see anything anywhere close that has anything to do with this case, don't read it, don't let anybody attempt to discuss the case with you, don't discuss the case even among yourselves. Keep an open mind until you heard [sic] all sides, the entire case, not just the State's case, but the defendants' side and the law as given by the Court at the end of the trial, but as I said, there are articles, some of it is on the front page here, and there may be something on the TV.

App. at 138-39. At the conclusion of the proceedings that day, the trial court reminded the jury of its earlier admonition regarding the press.

As the trial continued, the court repeatedly cautioned the jury to refrain from discussing the case with anyone or reading anything in the newspapers even tangentially related to the case. On March 17, 1982, the trial court instructed the jury at the conclusion of the proceedings

that day:

All right. I think it's a good time to recess.

But before we do, members of the jury, you will recall from time to time I have been cautioning the jury not to discuss the case, and not to read anything that might in any way have any effect on you as, as it pertains to this case. And I would just remind you once again, would you please continue to follow those same instructions.

And, I think more and more now you can realize the importance of what I said, that ultimately you will have to decide this case solely and you will have to solely on the evidence that you see and you hear in this courtroom. And, if you read something elsewhere or if someone talks to you or even if you talk among yourselves, it would be very, very hard for you to remember whether you heard it in the courtroom or you read it somewhere or whether it was evidence in this case.

So, it is -- nor if you should see something, don't read it. If someone wants to talk to you, don't let them

4

talk to you about the case. And, you will remember that this has to do with this case and this was the evidence in this case because some [sic] have to decide it solely on the evidence that you see and hear in the courtroom.

App. at 145-46.

On April 20, 1982, approximately two weeks before the jury received the case, the trial court issued the following admonition to the jury regarding an upcoming television program:

There is another thing that I must call to your attention, also. It's come to my attention that a television program is to be televised on Channel 4, NBC, on Tuesday evening, that's today, which may address topics which have been either examined or referred to here incourt [sic] . . . . I'm not going to tell you about a program and then tell you not to look at it, but I have to do it that way, because you might come on it by chance. So, the best way to do it is to tell you about it and then tell you not to look at it, whether someone reminds you and says you know, I saw

something, tell them not to talk about it. So, I'm going to ask you not to view the program, and further, I would ask, if possible, that the program not be watched by other members of your family, if possible, or if that's not done, that you not discuss or be present during any discussion with either your family or friends . . . .

App. at 156-57. The following day, the court asked the jurors if anyone had viewed the television program in question, and no one answered in the affirmative.

On May 13, 1982, the trial judge, at the conclusion of the entire case, charged the jury as follows:

Each defendant is entitled to have his case determined from his or her own acts and statements and the other evidence in the case which may be applicable to him or to her. And you're here to determine the guilt or innocence of the accused from the evidence before you and you are not called upon to

5

return a verdict as to the guilt or innocence of any other person or persons.

App. at 172. The jury received the case and commenced deliberations that afternoon.

In the morning of May 14, 1982, during jury deliberations, counsel for one of Barry's codefendants brought to the court's attention that a newscast that had been broadcast on WINS radio the previous evening concerned hearings in Washington on methaqualone usage. A recording of the story was transcribed for the record:

"At a Senate Labor and Human Resources Subcommittee hearing, Republican Senator Paula Hawkins says 90% of the sleeping pills also called the love drug is [sic] supplied illegally to young people in a two billion dollar a year business."

Now the recording has the following statement from Senator Hawkins'[s] testimony, "Under the guise of affording legitimate medical services these clinics provide a ready and accessible source of pharmaceutical Quaaludes, primarily for white collar young adults. The procedure is apparently quite simple. Bring between seventy five [sic] and two hundred dollars in cash, fill out a brief personal history form, claim personal or job problems and trade the

cash for a prescription of thirty to forty-five
Quaaludes."

 The broadcast thencontinues [sic], "Now Senator
Hawkins has introduced a bill to ban Quaaludes as a
so-called controlled substance. Hawkins says at least
130 people died from the drug last year. The Drug
Enforcement Administration says Quaaludes [are]
second in popularity among young people only to
marijuana."

App. at 201.

Counsel also brought to the court's attention an article in
that day's Bergen Record entitled "Federal Drug Agency
Targets Stress Relief Clinics." According to counsel, the
articles concerned

stress clinics and how they operate in a manner so
that a drug can be given out to young people who are
then abusers. They refer to people coming in paying
$125 for a fifteen to twenty minute visit to a stress
clinic in order to receive Quaalude prescriptions.

App. at 178. The Record has the largest circulation in
Bergen County. Counsel then requested that the court voir
dire and sequester the jurors and the court instruct them
not to read that day's issue of the Bergen Record. The
request was denied. However, the court instructed:

You shouldn't read about the case . . . . You shouldn't
listen to the radio about anything that might pertain,
not only about this case but anything that might
pertain to anything relating to something that might
pertain to a related matter. And you shouldn't read
anything that might pertain to a related matter that
might affect you in this case.

 So if you see or even think it might pertain to
something, put it aside. Don't read about it. Because
you have to decide this case solely on the evidence
that's been presented in this case . . . and not on
something that you heard on the radio or that you've
seen or that you will see, and there may be something
in the newspaper and I have to continuously guard
against that. And it never fails but that just at the time
when jurors are deliberating that some always thinks
[sic] something will be in the newspaper, something is
in the newspaper that they think might affect you in
your deliberations.

. . . So would you keep that in mind, not to read
anything. If you read a newspaper -- I can't keep you
from reading newspapers, but if something appears in
the newspaper that might affect you in this case, you
see the problems it creates.

App. at 203-04.

After lunch that same day, counsel for one of Barry's
codefendants advised the court that an alternate juror was
seen reading the Bergen Record. Counsel moved for a
mistrial or dismissal of the alternates; both motions were

denied. The court stated: "The record will show there are no
newspapers in the deliberating room." App. at 217. At the
end of the day, the court again instructed the jury:

I would ask that you not read or listen to what's on the
radio or on the TV, and I don't know if there'll be
anything on, but it just so happens that usually
something does happen at atime [sic] like this, that
something appears on the TV or on the radio which
deals with perhaps substances that might be related or
connected in some way with things that might remind
you of this case. . . .

And it's so important that you bear in mind that in
deciding this case you should not in any way be
influenced by anything other than . . . what you've
seen in the case . . . particularly something as I say,
that appears in a newspaper article or on the radio.

I would, therefore, urge you very, very strongly, if you
could stay away from reading even a headline that
might indicate anything like that. Don't even get
anywhere near anything like that.

App. at 221-22.

On May 17, 1982, counsel for one of Barry's
codefendants brought to the court's attention two
newspaper articles: one about the case itself from the May
15 issue of the Hudson Dispatch, with a six-column banner
headline reading "Mistrial Denied in Fort Lee Pill Pushing
Case," which reported sidebar conversations that someone
had leaked to the press, and one from the May 16 issue of
the Bergen Record entitled "New Jersey Weighs Ban Against
Quaaludes," which mentioned Barry and other defendants
and erroneously reported that they were linked to a stress

relief center in Atlantic City that was under investigation.
Counsel moved for the court to instruct the jurors not to
read the newspapers at all and to voir dire them to
determine whether any had seen the article. The motion
was denied. At the end of the day, the court again
instructed the jury:

> [A]gain, I would ask you please, please don't read
> anything -- and it's difficult for me to say don't read

8

> any newspaper because I'd like to ask you not to do
> that, not to read and not to listen to TV and not to
> listen to any radio, but I guess that's asking too much
> for me to ask you to do that. I'd like to ask you to do
> that but, again, I will caution you, please don't read
> anything that might have the slightest -- if you see any
> kind of a headline that might have anything to do with
> any type of controlled dangerous substance or anything
> that might have anything to do with any kind of a case,
> even remotely, obviously you shouldn't be looking at it
> or reading it. . . . And similarly, don't listen to anything
> on the radio or TV.

App. at 247-48.

On May 18, 1982, the court again instructed:

> Don't read anything in the newspapers that in any
> way, shape or form might affect you in any possible
> way because it is important that you decide this case
> based on the evidence you've seen and heard or the
> lack of evidence in the case. . . . [D]on't permit anyone
> to discuss this case with you either on the telephone,
> newspaper, radio, TV, et cetera.

App. at 255.

On May 19, 1982, the court instructed the jury "not to
read, listen, not to let anyone discuss the case with you."
App. at 262.

On May 20, 1982, shortly after the jury resumed
deliberations at 9:15 a.m., counsel brought to the court's
attention an article in that day's issue of the Bergen Record
with a six-column headline reading "Stress Center Jury
Replays Drug User's Testimony." Although the State
disputes that the jurors could have seen the paper because
it usually comes out after 9:30 a.m., defense counsel
represented to the court that he bought the paper
"downstairs" in the courthouse before the jury began

deliberating that day. Counsel again requested a voir dire of the jury, which request was denied. Later, the court instructed:

> [O]nce again, I would caution you that you are not to read anything in the newspapers. If any articles appear

> in the newspapers -- and the fact that articles appear in the newspapers, even though they may be allegedly a rehash of what occurs in court, you shouldn't read anything because the fact that something appears, it is not for the jury to read at all. You should rely only on the testimony, the evidence that was heard in court and not what you read in the newspaper and not what you hear outside of court as I've indicated earlier.. . . [D]o not read anything about the case. . . . I have to explain the importance of it to you and not to permit anyone to discuss the case with you, not to read anything, not to listen to anything that in any way might have some bearing on this case, that might influence you in the case.

App. at 272-73. Throughout most of the deliberations, the jury was sequestered during lunch breaks and supervised by a court officer during recess.

On May 24, 1982, Barry was found guilty on seventeen of the twenty-one counts. He was sentenced to concurrent three-year probationary terms on each of the seventeen counts, contingent upon his completion of a 180-day jail term, and fined, in the aggregate, $85,425. He appealed his conviction, requesting that he be represented on appeal by a court-appointed attorney. The state court rejected this request and subsequently dismissed his appeal for lack of prosecution. His petition for certification to the New Jersey Supreme Court was denied.

Barry filed a petition in the district court pursuant to 28 U.S.C. S 2254 for a writ of habeas corpus. He asserted that he was indigent and entitled to court-appointed counsel to prosecute his state appeal. The district court dismissed the petition for failure to exhaust state remedies. We vacated and remanded. Barry v. Brower, 774 F.2d 1150 (3d Cir. 1985) (table). The district court thereafter granted Barry's petition, and we affirmed with instructions to the district court to order that Barry be released from state custody unless the state court entered an order within thirty days reinstating his state appeal and appointing counsel. See Barry v. Brower, 864 F.2d 294 (3d Cir. 1988).

Subsequently, the Superior Court of New Jersey,
Appellate Division, affirmed Barry's conviction. In the

portion of the opinion that addressed the issue we face in
this appeal, the court wrote:

> When a trial court is presented with a post-
> impanelment voir dire motion based upon the potential
> jury exposure to trial publicity, the court must employ
> a two-part inquiry. First, the court should determine if
> the disseminated information has the capacity to
> prejudice the defendant. If so, the court should then
> determine whether there is a realistic possibility that
> such information may have reached one or more of the
> jurors. "Relevant considerations include the extent,
> notoriety, and prominence of the media coverage, with
> particular reference to the aspects found particularly
> prejudicial by the Court."
>
> "The procedure of questioning an impaneled jury
> when prejudicial publicity threatens the fairness and
> integrity of a defendant's trial should not be invoked
> begrudgingly." Similarly, however, the existence of
> some publicity relating to the defendant or the
> proceedings will not automatically require that the
> judge hold a voir dire.
>
> In an appropriate case, an alternative to
> sequestration exists in the judge's issuance of "clear
> and definitive" instructions to the jury not to read or
> listen to media reports of the trial, and to decide issues
> only on the evidence presented in court. Where
> cautionary instructions are appropriate and properly
> given, there is a presumption that jurors acted in good
> faith in following those instructions. Even where
> several jurors have been exposed to a media report
> about the case, a mistrial need not be directed if the
> report does not mention any defendants by name and
> the judge instructs the jury that the report had nothing
> to do with the defendants.
>
> Where juror prejudice is alleged, it is within the
> discretion of the trial judge to determine whether relief
> should be granted. On appeal, we will not reverse a
> discretionary decision of the trial judge unless we are
> satisfied that a manifest denial of justice resulted
> below. Here, we have carefully reviewed all allegations

> of juror prejudice and find them clearly to be without
> merit. We are satisfied that no manifest denial of
> justice has occurred.
>
> Regarding the articles concerning the case which
> appeared in the Bergen Record and the Hudson
> Dispatch, we note that nothing in the record indicates
> the jurors actually or probably read them or heard
> prejudicial media reports. Under these circumstances,
> we find no prejudice resulting in a manifest denial of
> justice occurred.

State v. Barry, No. A-720-82T4, slip op. at 84-86 (N.J.
Super. Ct. App. Div. Nov. 22, 1991) (per curiam) ("App. Div.
Op.") (quoting State v. Bey, 112 N.J. 45, 86, 89, 548 A.2d
846, 867, 869 (1988)) (citations omitted). The New Jersey
Supreme Court denied a petition for certification.

Following the state court affirmance of his conviction,
Barry was ordered to pay the fine. When he failed to do so,
a motion seeking to hold him in contempt was filed by the
Bergen County Probation Department. Concluding that
Barry was unable to pay the fine, the state court entered an
amended Judgment of Conviction, which ordered Barry, in
lieu of paying the fine, to perform 500 hours of community
service. Barry's probation supervision ended on or about
February 1, 1993.

This petition for a writ of habeas corpus pursuant to
S 2254 was filed in the district court on July 12, 1994,
when Barry was still obligated to complete his community
service under the direction of the Morris County Probation
Department. The petition named as respondents the Bergen
County Probation Department and Peter Verniero, the
Attorney General of New Jersey. His petition raises several
issues, including whether the trial judge violated his Sixth
Amendment rights by refusing to voir dire the jury during
its deliberations concerning possible prejudice arising from
media coverage of the case.

The district court granted the petition, ordering that he
be released from community service. It also held that his
community service obligation constituted custody for
habeas corpus purposes. In addition, the district court held
that the media coverage during jury deliberations could

12

have potentially prejudiced one or more jurors and,
therefore, the trial court's failure to voir dire the jury was

an error of constitutional magnitude. The district court determined that the remaining claims had no merit. This appeal followed.

The State raises three issues in this appeal. First, was Barry "in custody" pursuant to 28 U.S.C. S 2254(a)? Second, did the trial court's failure to voir dire or sequester the jury after becoming aware of the media attention the case received violate Barry's Sixth Amendment right to have his case tried by an impartial jury? Finally, did the district court err by failing to give the State the opportunity to retry Barry? We raise sua sponte the issue of whether, assuming Barry is "in custody," either of the respondents is his "custodian" for purposes of S 2254(a).

II.

Our appellate jurisdiction is pursuant to 28 U.S.C. SS 1291 and 2253. The district court determined it unnecessary to engage in any fact finding. Accordingly, we exercise plenary review over the district court's grant of habeas corpus. United States v. Cleary, 46 F.3d 307, 3019-10 (3d Cir. 1995); Lesko v. Owens, 881 F.2d 44, 50 (3d Cir. 1989). This standard is derived from the purpose of a reviewing court in a habeas proceeding, which is to review state cases " `for violations of federal constitutional standards.' " Lesko, 881 F.2d at 50 (quoting Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972)).

III.

A. Custody

The first issue in this appeal is whether Barry was "in custody" for purposes of S 2254(a) when he was resentenced in 1993 to 500 hours of community service. Section 2254(a) provides that federal courts have jurisdiction to entertain an application for habeas relief only if a petitioner is "in custody" in violation of the laws, treaties, or Constitution of the United States. This

13

requirement "is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty." Hensley v. Municipal Court, 411 U.S. 345, 351, 93 S. Ct. 1571, 1574 (1973). In making a custody determination, a court looks to the date that the habeas petition was filed. See Carafas v. LaVallee, 391 U.S. 234, 238-40, 88 S. Ct. 1556, 1559-61 (1968).

Barry argued, and the district court agreed, that S 2254(a)'s custody requirement was satisfied because Barry was subject both to " `significant restraints on [his] liberty' . . . which were `not shared by the public generally,' " Dist. Ct. Op. at 6 (quoting Jones v. Cunningham, 371 U.S. 236, 240, 242, 83 S. Ct. 373, 376, 377 (1963)), and " `some type of continuing governmental supervision.' " Id. (quoting Tinder v. Paula, 725 F.2d 801, 803 (1st Cir. 1984) (citing Spring v. Caldwell, 692 F.2d 994, 997-98 (5th Cir. 1982))). The State contends that the district court's conclusion is erroneous for two reasons. First, Barry's community service was imposed in lieu of his $85,000 fine, and his failure to complete community service would have resulted, at most, in the reimposition of the fine (or the proportional remainder thereof), rather than incarceration. Therefore, the State argues, Barry's case is indistinguishable from cases holding that the mere imposition of a fine is insufficient to constitute custody. Second, the State maintains that Barry was not subjected to the type of continuing governmental supervision usually associated with custody. In particular, the State points out that Barry took almost three years to complete his service, and that he had the ability to choose both the type of assignments as well as a specific schedule for completing these assignments. We conclude that the state has read S 2254(a)'s custody requirement too narrowly.

While early Supreme Court decisions held that incarceration was required before a defendant was "in custody" for habeas corpus purposes, see Hensley, 411 U.S. at 350 n.8, 93 S. Ct. at 1574 n.8, the Hensley Court noted that these decisions have not been cited by more recent Supreme Court decisions and "may no longer be deemed controlling." Id. Instead, the meaning of "custody" has been broadened so that, in the S 2254(a) context, it is

14

no longer limited to physical custody. See Justices of the Boston Mun. Ct. v. Lydon, 466 U.S. 294, 301, 104 S. Ct. 1805, 1810 (1984) (pretrial release on personal recognizance constitutes custody); Hensley, 411 U.S. at 349-51, 93 S. Ct. at 1573-75 (release on personal recognizance pending execution of sentence constitutes custody); Jones, 371 U.S. at 240-43, 83 S. Ct. at 375-77 (parole tantamount to custody); see also Barry, 864 F.2d at 296 (probation constitutes custody for habeas corpus purposes).

Despite this "subtle shift[ ]" in the custody requirement, see Lefkowitz v. Fair, 816 F.2d 17, 19 (1st Cir. 1987), courts continue to recognize that this custody requirement

is designed "to limit the availability of habeas review `to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.' " Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 894 (2d Cir.) (quoting Hensley, 411 U.S. at 351, 93 S. Ct. at 1575), cert. denied, ___ U.S. ___, 117 S. Ct. 610 (1996). Accordingly, several courts have held that the imposition of a fine or restitution does not constitute "custody." See, e.g. , Barnickel v. United States, 113 F.3d 704, 706 (7th Cir. 1997); United States v. Michaud, 901 F.2d 5, 7 (1st Cir. 1990) (per curiam); Dremann v. Francis, 828 F.2d 6, 7 (9th Cir. 1987) (per curiam). Likewise, several courts have held that the imposition of certain civil disabilities does not constitute "custody." See, e.g., Lefkowitz, , 816 F.2d at 20 (revocation of medical license is not custody); Lillios v. New Hampshire, 788 F.2d 60, 61 (1st Cir. 1986) (per curiam) (fine and suspension of driver's license is not custody); Ginsberg v. Abrams, 702 F.2d 48, 49 (2d Cir. 1983) (per curiam) (petitioner's removal from the bench, revocation of his license to practice law, and disqualification as a real estate broker and insurance agent is not custody).

No court has so far determined whether community service constitutes custody for purposes of S 2254(a). However, the Court of Appeals for the Ninth Circuit recently found custody where a petitioner was sentenced to fourteen hours of attendance at an alcohol rehabilitation program after being convicted of driving while intoxicated. See Dow

15

v. Circuit Court of the First Circuit, 995 F.2d 922 (9th Cir. 1993) (per curiam). The court made this determination even though the petitioner could schedule his service over a three-day or five-day period. Concluding that this was sufficient to constitute custody, the Ninth Circuit wrote:

> The sentence in this case, requiring appellant's physical presence at a particular place, significantly restrains appellant's liberty to do those things which free persons in the United States are entitled to do and therefore must be characterized, for jurisdictional purposes, as "custody." Appellant "cannot come and go as he pleases." Hensley, 411 U.S. at 351, 93 S. Ct. at 1575. Moreover, appellant suffers a greater restraint upon his liberty--mandatory class attendance--than the restraint suffered by a person who is released upon his own recognizance. See id. at 351-53, 93 S. Ct. at 1574-76.

Id. at 923 (emphasis added).

We find the Dow decision quite compelling and analogous to this matter. Like the petitioner in Dow, the State did not monitor or restrict Barry's every act. Moreover, both petitioners were afforded a certain amount of flexibility to schedule when they would complete their respective obligations. Nevertheless, as the Ninth Circuit recognized, an individual who is required to be in a certain place--or in one of several places--to attend meetings or to perform services, is clearly subject to restraints on his liberty not shared by the public generally.

Moreover, the State's reliance on the so-called "fine-only" cases does not alter this analysis. The instant case is readily distinguishable from cases in which courts have held that a fine-only sentence does not constitute custody, because such sentences implicate only property, not liberty. See Hanson v. Circuit Court of the First Judicial Circuit of Ill., 591 F.2d 404, 407 n.6 (7th Cir. 1979); see also Lefkowitz, 816 F.2d at 20 ("Habeas jurisprudence has traditionally been concerned with liberty rather than property, with freedom more than economics."); Ginsberg, 702 F.2d at 49 (limitations on economic mobility do not constitute custody). It is also distinguishable from those

16

cases where the petitioner was barred only from pursuing certain means of livelihood, see Lefkowitz, 816 F.2d at 20; Ginsberg, 702 F.2d at 49; Harvey v. South Dakota, 526 F.2d 840, 841 (8th Cir. 1975) (per curiam), rather than, as here, required to perform a certain type of work.

Equally unavailing is the State's contention that Barry was not "in custody" because he was not supervised on a continuous basis. As the Second Circuit recently noted in Poodry, 85 F.3d at 895, an analogous case involving banishment from an Indian tribe and reservation, " `[r]estraint' does not require `on-going supervision' or `prior approval.' " Id. ("While `supervision' (or harassment) by tribal officials or others acting on their behalf may be sporadic, that only makes it all the more pernicious. . . [because] the petitioners have no ability to predict if, when, or how their sentences will be executed."). But see Lefkowitz, 816 F.2d at 19 ("[H]e who seeks the succor of habeas corpus must be subject . . . `at the least, to some type of continuing governmental supervision.' "(quoting Tinder, 725 F.2d at 803)). While there is no suggestion that the Morris County Probation Community Service Program officials monitored Barry's every move, they nevertheless performed an oversight function and actually reported back to Bergen County Probation officials. See Letter from Peter

N. Brill, Bergen County Probation Officer, to Arthur Safir, Deputy Attorney General, Appellate Division 2 (August 12, 1994), App. at 126 ("Regrettably I have been informed that Mr. Barry has been less than cooperative with the Morris County Probation Community Service Program officials, and if he fails to cooperate, it is our intention to return the matter to Judge Moses for further disposition."). This level of supervision was clearly adequate.

Finally, we are unpersuaded by the State's argument that Barry was not "in custody" because he did not face imminent incarceration. Custody is established whenever a restraint on liberty is either actual or imminent. See Hensley, 411 U.S. at 351, 93 S. Ct. at 1575; see also Poodry, 85 F.3d at 894 ("[A] court [must] judge the `severity' of an actual or potential restraint on liberty." (emphasis added)). Courts have inquired into the imminence and inevitability of incarceration in the fine-only cases only

17

because the fine itself represented no severe restraint on liberty. For example, the courts in Poodry and Dow, where the restraints were found to be sufficiently severe, did not even discuss this factor. But see Lefkowitz, 816 F.2d at 20 ("He who seeks the writ must be incarcerated, or under immediate threat of incarceration, in order to meet the custody requirement of the habeas statute."). Because we conclude that Barry's community service obligation imposed an actual, severe restraint on his liberty, we need not consider an alternative method for establishing custody, namely, the threat of imminent or inevitable incarceration.

In sum, we hold that Barry's community service obligation constitutes custody for habeas corpus jurisdictional purposes. As part of his 1993 resentencing, Barry was ordered to perform 500 hours of community service under the direction of the Morris County Community Service Program. Although Barry was given approximately three years to complete this service, as well as options regarding the type and hours of service, there can be no doubt that these conditions significantly restrained his liberty "to do those things which in this country free [people] are entitled to do." Jones, 371 U.S. at 243, 83 S. Ct. at 377. The district court correctly held that the community service obligation which Barry was required to complete constituted custody within the meaning of S 2254(a).

B. The Proper Respondent(s)

At the time he filed his petition, Barry was under the

supervision of the Morris County Community Services Program. However, he named as respondents only the Attorney General and the Bergen County Probation Department. Because of this discrepancy, we raised sua sponte whether Barry named the correct respondent(s) and requested the parties to submit letter briefs on the issue. See Braden v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 494-95, 93 S. Ct. 1123, 1129 (1973) ("The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.").

In response to our request, both parties agree that the state court order of January 13, 1993 transferred Barry's

community service obligation to the Morris County Probation Community Service Program, and that Barry did not file his habeas petition until June 12, 1994. However, they disagree as to the implication of these dates.

Barry contends that the Bergen County Probation Department, one of the named respondents, did not relinquish custody of either the case or of Barry himself as a result of the January 13 order. The order clearly states, "If this Sentence is not completed, the Fine shall be reinstated." App. at 123. Accordingly, Barry argues, they retained oversight and custody. He also points to the letter dated August 12, 1994 from the Chief Probation Officer of Bergen County to the Deputy Attorney General, which states that Bergen County Probation will "return the matter to Judge Moses for further disposition" if Barry fails to cooperate with the Morris County Community Service Program. App. at 125-26. Finally, Barry argues that as the Attorney General of New Jersey was listed as a respondent, and as he is the highest ranking law enforcement officer in New Jersey with overall supervisory authority and responsibility, he is clearly the custodian of Barry.

The Attorney General's office asserts, by contrast, that Barry failed to name as a proper party-respondent either the particular probation officer responsible for his supervision or the official in charge of the probation agency. They also point to a letter attached to their response to this court's questions which explains that Barry was supposed to meet with a probation officer in Morris County, and once he had completed his community service obligation, the case would be closed. The Attorney General's office also argues that the Attorney General is not the proper respondent.

We are not persuaded by the State's arguments. The Advisory Committee Note to Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rules Governing Section 2254 Cases") provides that where

> [t]he applicant is in custody in any other manner differing from [jail, prison, or other actual physical restraint, or probation or parole] due to the effects of the state action he seeks relief from[, t]he named

19

> respondent should be the attorney general of the state wherein such action was taken.

Advisory Committee Note to Rule 2(b), Rules Governing Section 2254 Cases, 28 U.S.C. foll. S 2254 (1994). This text appears in the advisory committee note to Rule 2(b), governing cases where "the applicant is not presently in custody . . . but may be subject to such custody in the future[.]" Rule 2(b), Rules Governing Section 2254 Cases, 28 U.S.C. foll. S 2254 (1994). Nevertheless, the text of the Advisory Committee Note is written in broad language and is preceded by the explanation that it is "worthwhile to spell out the various situations which might arise and who should be named as respondent(s) for each situation." Advisory Committee Note to Rule 2(b), Rules Governing Section 2254 Cases; cf. Reimnitz v. State's Attorney of Cook County, 761 F.2d 405, 409 (7th Cir. 1985) ("The important thing is not the quest for a mythical custodian, but that the petitioner name as respondent someone (or some institution) who has both an interest in opposing the petition if it lacks merit, and the power to give the petitioner what he seeks if the petition has merit--namely, his unconditional freedom.").

The State cites this note but, without explanation, asserts that the Attorney General was not Barry's custodian. Based on the plain language of the advisory committee note, the argument of the State must fail. We conclude that the Attorney General is properly named as a respondent in this matter. Moreover, because Bergen County authorities retained jurisdiction over Barry, they too were properly named as a respondent here.

IV.

Having determined that the district court did, in fact, have subject matter jurisdiction to consider Barry's petition, and that the proper respondents have been named, we now consider whether Barry's constitutional right to an impartial jury was violated. The district court

found that Barry's Sixth Amendment right to a fair trial was violated when the trial judge refused to voir dire the jury, which may have been exposed to prejudicial media

coverage. The State contends this conclusion is erroneous for several reasons: (1) the district court's determination that the media coverage had the potential to prejudice the jury was ill-founded; (2) even assuming the media coverage could potentially prejudice the jury, the district court erred by failing to accord appropriate deference to the state court finding that "nothing in the record indicates the jurors actually or probably read them or heard prejudicial media reports[,]" App. Div. Op. at 85; and (3) even assuming the jurors were exposed to potentially prejudicial media coverage, the district court erred by not requiring the habeas petitioner to demonstrate a higher level of prejudice than a defendant must show on direct review. Because we conclude that the media coverage did not have the potential to prejudice the jury, we need not reach the State's alternative arguments.

The Due Process Clause of the Fourteenth Amendment guarantees state criminal defendants the right to a trial by an impartial finder of fact. See Morgan v. Illinois, 504 U.S. 719, 726, 112 S. Ct. 2222, 2228 (1992); Irvin v. Dowd, 366 U.S. 717, 721-22, 81 S. Ct. 1639, 1641-42 (1961). [1] In both civil and criminal cases on direct appeal, we

> utilize a three step procedure to determine whether publicity during the course of the trial has prejudiced the jury. "First, a court determines whether the news coverage is prejudicial. Second, if it is, the court determines whether any jurors were exposed to the coverage. Third, if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality."

_____

1. The district court and both parties identify this right as stemming from the Sixth Amendment. This is not strictly correct. The Sixth Amendment, made applicable to the states via the Fourteenth Amendment, requires that serious criminal offenses be tried by a jury. See Duncan v. Louisiana, 391 U.S. 145, 149, 88 S. Ct. 1444, 1447 (1968). The Due Process Clause requires that a factfinder at a criminal trial, be it a judge or a jury, be impartial. See Morgan, 504 U.S. at 727, 112 S. Ct. at 2229 ("[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment.").

United States v. DiSalvo, 34 F.3d 1204, 1221-22 (3d Cir. 1994) (quoting Waldorf v. Shuta, 3 F.3d 705, 709-10 (3d Cir. 1993)); see also Government of the Virgin Islands v. Weatherwax, 20 F.3d 572, 574-78 (3d Cir. 1994) (utilizing this framework).

To determine whether publicity during the course of a trial has prejudiced a jury, we must first consider whether the news coverage is prejudicial. See DiSalvo, 34 F.3d at 1221 (quoting Waldorf, 3 F.3d at 709-10). We make the prejudice " `determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror.' " Waldorf, 3 F.3d at 710 (quoting United States v. Gilsenan, 949 F.2d 90, 95 (3d Cir. 1991)). "The likelihood of substantial prejudice turns on all of the surrounding circumstances, the most important being the nature of the information learned by the jurors and the manner in which it was conveyed." Government of the Virgin Islands v. Dowling, 814 F.2d 134, 138 (3d Cir. 1987). The party claiming prejudice has "the burden of demonstrating the likelihood of actual prejudice." Waldorf, 3 F.3d at 710.

In two recent cases, we have held certain news broadcasts and publications to be non-prejudicial. In DiSalvo, 34 F.3d at 1222, the defendant claimed he had been prejudiced by news articles that "mentioned that he had twice been acquitted by federal juries, characterized him as a `mob lawyer,' [and] made reference to a prior charge of tax evasion levied against him." We concluded that the district court was correct in finding that "none of the publications" at issue "ma[de] reference to the fact that [the defendant] had committed a crime, had been convicted of a crime or had acknowledged that he was guilty of any conduct charged in the indictment." Id. We also noted that "while the `mob lawyer' characterization was not necessarily flattering to [the defendant], use of this term is not sufficiently prejudicial to constitute a violation of [his] Sixth Amendment rights." Id.

In Gilsenan, 949 F.2d at 92, the appellants contended that they had been prejudiced by a news article and a television broadcast concerning a plea agreement ultimately rejected by the district court. The news reports stated that

the government conceded it had a weak case and that the

appellants maintained their innocence. The reports criticized the government for attempting to dispose quietly of a controversial case in which it had little confidence and noted that the district court rejected the agreement because it did not provide for incarceration of the appellants. We held that these reports were not prejudicial from an objective viewpoint because they cast the government but not the appellants in a bad light. See also United States v. DeLarosa, 450 F.2d 1057, 1062 (3d Cir. 1971) (no potential for prejudice from news story concerning shots fired into home of government's chief witness where perpetrator was unknown).

Some of our decisions would appear to be in tension with the above holdings. In Weatherwax, 20 F.3d at 574, we found prejudice. The article at issue seriously misquoted the defendant's testimony to make it appear as if he had cocked the gun and taken aim before he shot the victim. The inaccuracies severely undercut the defendant's self-defense theory. See also DiSalvo, 34 F.3d at 1222 n.16 (distinguishing Weatherwax).

In Waldorf, 3 F.3d at 711, which concerned a trial over damages resulting from an automobile accident that rendered the plaintiff a quadriplegic, we found prejudicial a news story concerning a $30 million verdict rendered for a plaintiff in another case who was rendered a quadriplegic after a shooting. We deemed it highly relevant that the media reports "placed before the jury the very same type of information the district court had excluded as inadmissible." Id. at 707. See also United States v. Bertoli, 40 F.3d 1384, 1395 (3d Cir. 1994) (in Waldorf, "the circumstances posed a serious risk that an extraneous and inadmissible newspaper article may have vitiated procedural rulings based on fairness to both sides"). We also noted that the article involved a "factually similar . . . case," even though it was "completely unrelated," Waldorf, 3 F.3d at 712 n.7, and that the jury was exposed to it the night before and the day of its verdict.

In Dowling, 814 F.2d at 135-36, a newspaper article published during trial revealed that the defendant had previously been convicted of bank robbery, the same crime

with which he was charged in that case. We concluded that information concerning the defendant's prior criminal conduct had the potential for prejudice.

Finally, in United States ex rel. Greene v. New Jersey, 519 F.2d 1356, 1357 (3d Cir. 1975) (per curiam), we held

that information concerning the defendant's attempt to enter a plea of non vult was prejudicial. The Gilsenan court distinguished Greene based on the fact that the defendant in Greene, rather than the state, had initiated plea negotiations, and that he had been willing to expose himself to a life sentence by pleading guilty. See Gilsenan, 949 F.2d at 96-97 n.11.

Based on the foregoing, we conclude that all of the publications and broadcasts at issue are non-prejudicial. We observe that the headline of the May 15 article in the Hudson Dispatch, using the derogatory term "pill pushing," and the headline of the May 20 article in the Bergen Record calling a witness a "drug user," are certainly no more prejudicial than the use of the term "mob lawyer" in DiSalvo, 34 F.3d at 1222. Indeed, the terms "pill pushing" and "drug user" do not directly refer to Barry and are less prejudicial than "mob lawyer," which we held to be "not sufficiently prejudicial to constitute a violation of [the defendant's] Sixth Amendment rights." Id. Likewise, we are unable to find that Barry was prejudiced by the May 20 article simply because it reported that the trial court denied a motion for a mistrial. Cf. Gilsenan, 949 F.2d at 95 (no prejudice by reports that district court rejected proposed plea agreement).

We also conclude that the Bergen Record article of May 16, which mentioned Barry by name and incorrectly reported that he had ties to a second stress relief center that was under investigation, is not prejudicial under the reasoning of DiSalvo. In DiSalvo, the court held that the media reports at issue were not prejudicial because they did not state that the defendant committed a crime, was convicted of a crime, or acknowledged guilt of any conduct charged in the indictment. Here, there were allegations only that Barry had ties to another clinic that was under investigation, a far cry from stating that he was actually guilty of or had been convicted of another crime. Further,

24

the fact that the report was inaccurate adds little. Even assuming the reports had been accurate, they were not prejudicial under DiSalvo.

Finally, we conclude that the May 14 WINS radio broadcast of Senator Hawkins's testimony, and the Bergen Record article of the same date recounting Senator Hawkins's testimony, were not prejudicial so as to deny Barry his Fourteenth Amendment right to an impartial jury. While the Senator's testimony concerned a factually similar yet completely unrelated case, the similarity with our

decision in Waldorf ends there. As we observed in Bertoli, the Waldorf court accorded significant weight to the fact that the jury was exposed to " `the very same type of information the district court had excluded as inadmissible.' " Bertoli, 40 F.3d at 1395 (quoting Waldorf, 3 F.3d at 707). This exposure "may have vitiated procedural rulings based on fairness to both sides." Id. It is also important to note that the Waldorf court found it "significant" . . . that "the jury was exposed to the Queens verdict both the night before and the very same day that it reached a verdict on Waldorf 's damage claim." Waldorf, 3 F.3d at 713. Here, no such concerns are present. There is no suggestion that media coverage of the Senator's testimony vitiated any of the trial court's procedural rulings. Moreover, the verdict was rendered ten days after the reports were broadcast. Waldorf does not assist the petitioner.

We hold that the district court erred as a matter of law by concluding that the media coverage at issue had the potential to prejudice one or more jurors. Because the media coverage was not prejudicial, we need not consider the second and third parts of the three-part procedure set forth in DiSalvo. Nor do we consider whether the district court erred by failing to provide the State with an opportunity to retry the petitioner.

V.

The judgment of the district court will be reversed. The matter will be remanded to the district court with a direction to dismiss the petition.

25

STAPLETON, J., Circuit Judge, Dissenting:

On January 13, 1993, Barry pled guilty to violating his probation by failing to pay an $85,000 fine. The court then entered an order providing as follows:

> The defendant shall serve five hundred (500) hours of Community Service: upon completion of this sentence the $85,000.00 Fine previously imposed shall be forgiven. If this Sentence is not completed, the Fine shall be reinstated.

App. at 123. Barry's term of probation ended one month later on February 1, 1993.

Barry filed his petition initiating this proceeding on July 12, 1994. As of that date, he had not completed his 500

hours of community service. On August 24, 1994, the Vicinage Chief Probation Officer responded to an inquiry from the New Jersey Attorney General's Office as follows:

> If I understand your inquiry correctly, you are interested in being advised as to whether or not Mr. Barry is currently under Probation supervision. He is not, but he is still obligated to perform the fullfive hundred hours of community service.

App. at 126.

The foregoing is the sum total of the record information concerning Barry's status at the time he filed his petition. On this record, I would hold that he has not carried his burden of establishing the jurisdiction of the district court to entertain his petition. See Charles Allen Wright, et al., Federal Practice and Procedure, S 3522 at 63-65 (2d ed. 1984).

Section 2254(a) of Title 28 of the United States Code provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

26

(emphasis added).

It is well settled that a person whose only obligation is to pay a criminal fine is not "in custody" for purposes of S 2254. See, e.g., United States v. Watroba, 56 F.3d 28, 29 (6th Cir. 1995); United States v. Segler, 37 F.3d 1131, 1137 (5th Cir. 1994); United States v. Michand, 901 F.2d 5 (1st Cir. 1990). This is true because such a person's liberty is not currently restrained, even though there is the potential that he may be incarcerated in the future if thefine is not paid. The potential for future incarceration is insufficient to confer jurisdiction because the person can avoid incarceration by meeting his obligation and thus holds the "keys to the prison" in his pocket. See Dremann v. Francis, 828 F.2d 6, 7 (9th Cir. 1987); Tinder v. Paula, 725 F.2d 801, 804 (1st Cir. 1984).

This record does not suggest that Barry's liberty was restrained when he filed his petition. Unlike a person on probation, he was apparently free to come and go as he

wished. He was not obligated to secure the consent of a probation officer when he decided where or how he would live or what his activities would be on any given day. He had no unfulfilled sentence hanging over his head that he might be required to serve at any point. He was simply required to donate 500 hours of community service of an unspecified nature on an unspecified schedule.1 If he should fail to meet this obligation within a reasonable period of time, his fine would be reinstated pursuant to the court's order. In the meantime, he held the keys to the prison in his pocket.

I realize that the Supreme Court of the United States in recent decades has expanded the concept of "custody" for purposes of S 2254 beyond physical incarceration. It has never, however, held anyone to be in "custody" who enjoyed the freedom that Barry enjoyed at the time he filed his petition. In my view, he was in a position not materially different from a person whose only obligation to the state is the payment of a fine, and I would follow the well-

_____

1. The government represents that Barry was free to choose the service he would undertake and the hours of his performance. Appellant's Brief at 24. Barry does not contest this representation.

27

established precedent holding that such a person is not "in custody."

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

28